UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Ann Coyle, on behalf of herself and all others similarly situated, | ) ) ) | |
| | ) | No. 08-cv-03407 |
| Plaintiff, | ) ) | |
| | ) | Judge Holderman |
| v. | ) ) | |
| | ) | Magistrate Judge Cox |
| Avent America, Inc.; Philips Electronics North America Corporation; Gerber Products Company; Handi-Craft Company; Nalge Nunc International Corp.; Playtex Products, Inc.; | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR**
**FINDING OF RELATEDNESS AND REASSIGNMENT OF CASE**

Plaintiff Ann Coyle, by her attorneys, respectfully requests that the Court enter an order

finding that the case captioned *Coyle v. Avent America, Inc., et al.*, 08-cv-03407 (filed June 12,

2008, assigned to Judge Holderman) is related to *Banse v. Avent America, Inc., et al.*, 08-cv-2604

(filed May 6, 2008, assigned to Judge Coar). A copy of the Complaint filed in the *Coyle* case

(omitting the exhibits) is attached hereto as Exhibit A, and a copy of the Complaint filed in the

*Banse* case (omitting exhibits) is attached hereto as Exhibit B. Plaintiff Coyle further requests

that the Court recommend to the Executive Committee of the Northern District of Illinois that

*Coyle v. Avent America, Inc., et al.* be reassigned to the Honorable David H. Coar. Plaintiff

Coyle will serve a copy of this Motion to both plaintiffs' and defendants' counsel in the *Banse v.*

*Avent America, Inc., et al.* case and counsel in the above-captioned case. In support of its

Motion, Plaintiff Coyle states:

1.      On June 12, 2008, Plaintiff Coyle commenced an action against Avent America, Inc. and others, styled *Coyle v. Avent America, Inc., et al.*, which was assigned to Judge Holderman.

2.      The *Banse* case was filed on May 6, 2008.

3.      Both the *Coyle* and *Banse* cases are brought on behalf of consumers of baby bottles and related products containing the hazardous chemical bisphenol A versus manufacturers of the products.  Plaintiff Banse has filed a motion before the Judicial Panel on Multidistrict Litigation to transfer approximately 14 cases that have been filed nationwide to Judge Coar's Court.  *See* Motion attached hereto as Exhibit C.  Plaintiff Coyle supports Plaintiff Banse's Motion.

4.      Both cases name as defendant Avent America, Inc.

5.      Both cases address the following common issues:

(a)      Whether the Hazardous Baby Products are defective;

(b)      Whether Defendants negligently manufactured, distributed, marketed, tested and/or sold the Hazardous Baby Products;

(c)      Whether there is an increased risk of serious health problems as a result of the BPA in the Hazardous Baby Products;

(d)      Whether Defendants conducted adequate studies and quality tests of their Hazardous Baby Products to determine whether and to what extent the Hazardous Baby Products were contaminated with BPA or leached BPA following exposure to heat or liquids;

(e)      Whether Defendants engaged in deceptive and unfair business and trade practices;

(f)     Whether Defendants knowingly or negligently concealed or omitted material information concerning the safety of the Hazardous Baby Products;

(g)     Whether the Class is entitled to injunctive relief; and

(h)     Whether Defendants falsely and fraudulently misrepresented in their advertisements and promotional materials, and other materials the safety of the Hazardous Baby Products.

6.     Under Local Rule 40.4(a), two or more civil cases may be related if:

(a)     the cases involve the same property;

(b)     the cases involve some of the same issues of fact or law;

(c)     the cases grow out of the same transaction or occurrence; or

(d)     in class action suits, one or more of the classes involved in the cases is or are the same.

LR 40.4(a)(1)-(4) (2006).

7.     The *Coyle* case is "related" to *Banse* within the meaning of Local Rule 40.4(a). Like *Banse*, the *Coyle* case seeks damages based upon the same or similar allegations related to Bisphenol A.   Thus, the *Coyle* case "grow[s] out of the same transaction or occurrence" as *Banse*.  LR 40.4(a)(3).  The *Coyle* case also asserts many of the same legal claims and theories that are being asserted in the *Banse* case, and therefore "involve some of the same issues of fact or law."  LR 40.4(a)(2).  Finally, the plaintiffs in *Coyle* fall within the definition of the class that the plaintiffs in the *Banse* case seek to certify.  *See* LR 40.4(a)(4).

8.     Under Local Rule 40.4(b), two or more related cases may be reassigned where:

(a)     both cases are pending in the Northern District of Illinois;

(b)     the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;

(c)      the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

(d)      the cases are susceptible of disposition in a single proceeding.

LR 40.4(b)(1)-(4).

9.      The *Coyle* case should be reassigned to Judge Coar's docket.  *First*, *Banse* is pending in the Northern District of Illinois.  *Second*, *Coyle* is based upon the same factual allegations, and asserts the same legal claims and theories, as *Banse*, and the handling of all such related cases by the same judge will result in judicial economy.  *Third*, none of the related putative class actions against defendants in either *Coyle* or *Banse* filed to date has progressed to a point where designating *Coyle* as related would delay proceedings.  *Finally*, *Coyle* may be susceptible to disposition in the same proceeding as the *Banse* case.

WHEREFORE, Plaintiff Coyle respectfully requests that the Court enter an order: (i) finding the *Coyle* case "related" to *Banse*; and (ii) recommending to the Executive Committee that *Coyle* be reassigned to Judge Coar's docket for consolidation with *Banse*.

DATED this 20th day of June, 2008.

FUTTERMAN HOWARD WATKINS WYLIE
& ASHLEY, CHTD.


By: /s/ John R. Wylie_____
FUTTERMAN HOWARD WATKINS WYLIE
& ASHLEY, CHTD.
Charles R. Watkins
John R. Wylie
Ron Futterman
122 S. Michigan Ave., Suite 1850
Chicago, IL  60603
Telephone:  (312) 427-3600
Facsimile:  (312) 427-1850

KELLER ROHRBACK LLP.
Lynn Lincoln Sarko
Juli E. Farris
Gretchen Freeman Cappio
Laura R. Gerber
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Attorneys for Plaintiff

[G:\DA\Bisphenol A\Pleadings\Relatedness.Mot.docx]

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that true and correct copies of the foregoing NOTICE OF MOTION and PLAINTIFF'S MOTION FOR FINDING OF RELATEDNESS AND REASSIGNMENT OF CASE were filed electronically pursuant to the CM/ECF procedures on June 20, 2008 and will, therefore, be served electronically upon:

| | |
|---|---|
| Kristen Elizabeth Hudson | Norman Rifkind |
| Paula Enid Litt | Lasky & Rifkind, Ltd. |
| Schopf & Weiss LLP | 350 North LaSalle Street |
| One South Wacker Drive | Suite 1320 |
| 28th Floor | Chicago, IL 60610 |
| Chicago, IL 60606 | (312) 634-0057 |
| (312) 701-9300 | |

and on the following by depositing the same in the U.S. Mail before 5:00 p.m. on June 20, 2008, proper first class postage prepaid:

Avent America
Illinois Corporation Service
801 Adlai Stevenson Drive
Springfield, IL  62703

Gerber Products Company
CSC – Lawyers Incorporating Service
601 Abbot Road
East Lansing, MI  48823

Handi-Craft Company
c/o Peter W. Herzog, Registered Agent
515 North 6th Street, 24th Floor
St. Louis, MO  63101

Nalge Nunc International Corporation
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

Philips Electronics North America Corp.
Corporation Service Company
2711 Centerville Road, Suite 4000
Wilmington, DE  19808

Playtex Products, Inc.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

/s/  John R. Wylie_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Ann Coyle, on behalf of herself and all others similarly situated, | ) ) ) | |
| | ) | No. 08-cv-03407 |
| Plaintiff, | ) | |
| | ) | Judge Holderman |
| v. | ) | |
| | ) | Magistrate Judge Cox |
| Avent America, Inc.; Philips Electronics North America Corporation; Gerber Products Company;  Handi-Craft Company;  Nalge Nunc International Corp.; Playtex Products, Inc.; | ) ) ) ) ) | |
| Defendants. | ) | |

**NOTICE OF MOTION**

      To:    Counsel of Record

      PLEASE TAKE NOTICE that on Wednesday, July 9, 2008, at 9:00 a.m., we shall appear before the Honorable Judge David H. Coar, United States District Court for the Northern District of Illinois, Courtroom 1419, 219 South Dearborn Street, Chicago, Illinois, and then and there present PLAINTIFF ANN COYLE'S MOTION FOR FINDING OF RELATEDNESS AND REASSIGNMENT OF CASE, which is filed with the Court this same day via the ECF System and is being served upon you.

                        Respectfully submitted,


                        s/ John R. Wylie
                        One of Plaintiffs' Attorneys

Date:  June 20, 2008

John R. Wylie
Charles R. Watkins
FUTTERMAN HOWARD WATKINS
   WYLIE & ASHLEY, CHTD.
122 S. Michigan Ave.
Suite 1850
Chicago, IL 60603
312-427-3600
312-427-1850 (fax)

KELLER ROHRBACK LLP.
Lynn Lincoln Sarko
Juli E. Farris
Gretchen Freeman Cappio
Laura R. Gerber
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
 (206) 623-1900
 (206) 623-3384 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Ann Coyle, on behalf of herself and all others )
similarly situated, )
                                          )   No. 08-cv-03407
                             Plaintiff, )
                                          )   Judge Holderman
        v. )
                                          )   Magistrate Judge Cox
Avent America, Inc.; Philips Electronics North )
America Corporation; Gerber Products )
Company;  Handi-Craft Company;  Nalge Nunc )
International Corp.; Playtex Products, Inc.; )
                                          )
                             Defendants. )

## [PROPOSED] ORDER REASSIGNING
## <u>BASED ON RELATEDNESS</u>

Having considered the papers filed in support of Plaintiff Ann Coyle's Motion for

Finding of Relatedness and Reassignment of Case, pursuant to Local Rule 40.4, and for good

cause as shown, the Court hereby enters an Order:

      1.     Finding *Coyle v. Avent America, Inc., et al,* 08-cv-03407 (filed May 6, 2008,

assigned to Judge Coar) "related" to *Banse v. Avent America, Inc., et al*., 08-cv-2604 (filed May

6, 2008, assigned to Judge Coar); and

ORDER - Page 1

2.      Recommending to the Executive Committee that *Coyle* be reassigned to Judge

Coar's docket.


IT IS SO ORDERED.

Dated this _____ day of _____, 2008.



_____
UNITED STATES DISTRICT JUDGE

ORDER - Page 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ann Coyle, on behalf of herself and all others similarly situated,<br><br>                         Plaintiff,<br><br>    v.<br><br>Avent America, Inc.; Philips Electronics North America Corporation; Gerber Products Company; Handi-Craft Company; Nalge Nunc International Corp.; Playtex Products, Inc.;<br><br>                          Defendants. | No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY DEMAND**<br>FILED: JUNE 12, 2008<br>08CV3407<br>JUDGE HOLDERMAN<br>MAGISTRATE JUDGE COX<br><br>TC |

1.     Plaintiff, by her attorneys, brings this Class Action against Defendants Avent America, Inc., Gerber Products Company, Handi-Craft Company, Nalge Nunc International Corp., and Playtex Products, Inc. on her own behalf and on behalf of a class of all other similarly situated purchasers within Illinois and the United States, including all persons who purchased and/or acquired bottles or cups manufactured, sold and/or distributed by Defendants from May 2003 through the present ("Class Period"), which contained bisphenol A ("BPA"). BPA is a chemical produced in large quantities for use in the production of polycarbonate plastics and epoxy resin. BPA is found in certain food and drink packaging or containers, such as infant bottles and cups. BPA is also a developmental, neural and reproductive toxicant that is typically

COMPLAINT - Page 1

described as being "estrogenic," which means that it acts like the hormone estrogen. Scientists have linked even very low doses of BPA exposure to cancers, impaired immune function, early onset of puberty, obesity, diabetes, and hyperactivity, among other problems. Plaintiff brings this action for compensatory damages and for equitable, injunctive, and declaratory relief against Defendants, who designed, manufactured, marketed, sold and/or distributed products intended for young children containing BPA ("Hazardous Baby Products"). Plaintiff alleges the following upon her own knowledge, or where there is no personal knowledge, upon information and belief and the investigation of her counsel:

## I. NATURE OF THE ACTION

2. For years Defendants have manufactured and sold plastic baby bottles and/or training or "sippy" cups containing BPA, despite the scientific consensus that BPA poses an unacceptable risk to infants and young children. Despite Defendants' awareness of the risks of using BPA in products intended for use as food or drink containers for young children, Defendants continue to manufacture and sell Hazardous Baby Products to parents and to represent these products as safe. Even though safe alternatives to BPA are available, Defendants have chosen to prioritize their bottom lines over children's health and continue to manufacture and sell BPA-laced products.

3. As a parent who is ceaselessly exposed to a media advertising blitz touting the safety and effectiveness of Defendants' products, Plaintiff trusted that Defendants' brand-name feeding products were safe for children. Plaintiff placed her trust in companies, like Defendants, which hold themselves out as experts on caring for the health of infants and young children.

4.      Young children are especially at risk because for any given exposure, a smaller body size receives a greater effect and a larger dose. In addition, young children's developing body systems are extremely susceptible to chemical disruptions.

5.      Defendants' Hazardous Baby Products are unsuitable for use. The health impacts of these products are serious enough to cause governments around the world, such as Canada, to begin the process of banning such products. Yet, as of the date of this filing, Defendants' Hazardous Baby Products are still on the shelves, and Defendants still tout their safety and healthfulness.

6.      Under appropriate legal standards, and especially as viewed in the eyes of a "reasonable parent," Defendants' marketing is deceptive; their products are unsuitable for use; and their actions are unconscionable. Defendants manufactured and/or sold Hazardous Baby Products and should be required to compensate Plaintiff and similarly situated consumers for their damages.

## II. PARTIES

### A.      PLAINTIFF

7.      Plaintiff Ann Coyle is a resident of Highland Park, Illinois. Plaintiff purchased baby bottles manufactured by Defendants Avent America, Inc. and Handi-Craft Company (marketed as "Dr. Brown's" bottles), in approximately January, 2005. Plaintiff purchased these products for her young child, then age four months. Plaintiff purchased training cups from Defendants Avent America, Inc., Nalge Nunc International Corp., and Playtex Products, Inc. in approximately December, 2005. Plaintiff purchased these products for her young child, then age fifteen months. When Plaintiff purchased the bottles and cups for her children, she did not intend to expose them to BPA through the use of these products.

COMPLAINT - Page 3

8.     Defendant Avent America, Inc. ("Avent") is a corporation organized and existing under the laws of the state of Illinois which maintains its principal place of business in Bensenville, Illinois.  Avent manufactures plastic baby bottles, nipples, training cups, and/or other products that contain BPA.  Avent has conducted and continues to conduct business in Illinois by distributing for sale and selling its products through various stores or supermarkets located in Illinois.

9.     Defendant Philips Electronics North America Corporation is a corporation organized and existing under the laws of the state of Delaware which maintains its principal place of business in New York, New York.  In September 2006, Philips Electronics North America Corporation acquired Avent, and now manufactures plastic baby bottles, nipples, spill-resistant cups, and/or other products that contain BPA.  These products are marketed under the Philips AVENT brand.  Philips Electronics North America Corporation has conducted and continues to conduct business in the State of Illinois by distributing for sale and selling its products through various stores located in Illinois.

10.    Defendant Gerber Products Company ("Gerber") is a corporation organized and existing under the laws of the state of Michigan which maintains its principal place of business in Parsippany, New Jersey.  Gerber manufactures plastic baby bottles, nipples, training cups, and other products that contain BPA.  Gerber has conducted and continues to conduct business in Illinois by distributing for sale and selling its products through various stores and supermarkets located in Illinois.

11.    Defendant Handi-Craft Company ("Handi-Craft") is a corporation organized and existing under the laws of the state of Missouri which maintains its principal place of business in St. Louis, Missouri. Handi-Craft manufactures plastic baby bottles and other products that

COMPLAINT - Page 4

contain BPA under the brand name Dr. Brown's. Handi-Craft represents that Dr. Brown's bottles have a patented venting system, creating "positive pressure flow, just like breastfeeding." Handi-Craft has conducted and continues to conduct business in Illinois by distributing for sale and selling its products through various stores, supermarkets, and on-line retailers located in Illinois.

12.     Defendant Playtex Products, Inc. ("Playtex") is a corporation organized and existing under the laws of the state of Delaware which maintains its principal place of business in Westport, Connecticut. Playtex manufactures plastic baby bottles, nipples, training cups, and/or other products that contain BPA. Playtex has conducted and continues to conduct business in Illinois by distributing for sale and selling its products through various stores and supermarkets located in Illinois.

13.     Defendant Nalge Nunc International Corporation ("NNIC") is a corporation organized and existing under the laws of Delaware which maintains its principal place of business in Rochester, New York. Through its Outdoor Products Division, located in Rochester, New York, NNIC manufactures, markets and sells a variety of reusable plastic beverage containers, including the Grip'n Gulp™, a popular training cup for toddlers. NNIC has conducted and continues to conduct business in Illinois by distributing for sale and selling its products through various outdoor stores, and on-line retailers located in Illinois.

### III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than the Defendants. *See* 28 U.S.C.

§ 1332(d)(2)(A). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendants because they are authorized to do business and to conduct business in Illinois. Defendants have specifically marketed and sold the Hazardous Baby Products in Illinois, and they have sufficient minimum contacts with this state and/or sufficiently avail themselves to the markets of this state through their promotion, sales, and marketing within this state to render the exercise of jurisdiction by this Court permissible.

15. Furthermore, Plaintiff alleges that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of states other than Illinois, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

16. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) because Plaintiff resides in this District, a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction to the federal court in this District. Moreover, Defendant Avent is an Illinois corporation and other Defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein is and has been carried out in part within this judicial district.

## IV.   DEFENDANTS' BOTTLES, CUPS, AND CONTAINERS ARE HAZARDOUS TO CHILDREN'S HEALTH

### A.   THE DANGERS OF BPA EXPOSURE TO YOUNG CHILDREN

17. BPA is most commonly used to make clear polycarbonate plastic for consumer products, including baby bottles and cups. Through use, and especially through dishwasher cleaning and heating baby formula, milk and other beverages and foods, the plastic in baby bottles and other containers breaks down and leaches BPA into liquids and food.

COMPLAINT - Page 6

18.     Defendants have made calculated and profit-driven decisions to continue manufacturing and marketing baby products containing the industrial chemical BPA, despite their knowledge that their target consumers, i.e., new parents and the caregivers of young children, would not purchase and/or use these products if they were notified of this ingredient and the serious harm it can cause their children. Even as the scientific consensus emerged in the late 1990s regarding the inappropriateness of using BPA in baby bottles, training cups, pacifiers, and other baby products, Defendants continued to manufacture and market these products without notice to new parents. Defendants sold these products throughout the State of Illinois and the United States.

19.     New parents have every reason to be concerned about the safety of Hazardous Baby Products and to discontinue the use of such products that they have purchased. Recent publicity and government action have put new parents and other caregivers on notice of the scientific-consensus that Hazardous Baby Products pose an unacceptable risk to children.

20.     BPA is an endocrine disruptor; it is an estrogen receptor agonist (a substance that binds to a specific receptor and triggers a response in the cell), and such agonists can act like the body's own hormones, leading to similar physiological effects on the body. Exposure to environmentally relevant doses of BPA have been linked by laboratory studies to a variety of reproductive effects in animals, including reduced sperm production, alterations in prostate development in males, and increased rates of prostate cancer and alterations in mammary gland organization, brain development, and estrous cyclicity in females.

21.     A new draft report published by the National Toxicology Program, a division of the U.S. Department of Health and Human Services, states: "[T]he possibility that bisphenol A may alter human development cannot be dismissed." According to the draft report, it is possible

that exposure to BPA during infancy could cause changes in prostate and mammary tissue that raise the risk of cancer later in life. *See* Draft NTP [National Toxicology Program] Brief on Bisphenol A [CAS No. 80-05-7], April 14, 2008 (Exhibit A).

22.     Contamination or leaching of BPA into food and beverages occurs because the bond linking BPA monomers to one another to form polymer chains is unstable. This causes the polymer to decay over time. When liquid, such as baby formula or breast milk, contacts plastic bottles or spill-resistant cups containing BPA, the chemical is released into the liquid and the baby drinks it. High heat, such as the heat used when bottles are sterilized *according to Defendant manufacturers' instructions*, accelerates the leaching of BPA from plastic into baby formula or other liquid. Nonetheless, Defendants continue to recommend cleaning their products by boiling, or by putting them in a steam sterilizer (which Defendants Avent and Handi-Craft also sell) or the dishwasher.

23.     Since at least 1997, scientists have been concerned about the harmful effects of BPA. A substantial number of scientific studies and reports have shown BPA to be potentially toxic, even at very low doses. Recent studies have confirmed the significant health risks associated with very low levels of BPA exposure. *See* R. Steinmetz et al., *The Xenoestrogen Bisphenol A Induces Growth, Differentiation, and C-Fos Gene Expression in the Female Reproductive Tract*, Endocrinology. 1998 Jun;139(6):2741-7; S. Honma et al., *Low Dose Effect of In Utero Exposure to Bisphenol A and Diethylstilbestrol on Female Mouse Reproduction,"* Reproductive Toxicology, 16:117- 122, 2002; K. Kubo et al., *Low Dose Effects of Bisphenol A on Sexual Differentiation of the Brain and Behavior in Rats*, Neuroscience Research, 45(3):345-56, March 2003.

24.     Consumer Reports performed a revealing test on baby bottles back in 1999. The magazine purchased six plastic baby bottles and heated plastic from each in simulated baby formula. It found that the plastic from each of these bottles leached BPA. Consumer Reports calculated that an infant who drank formula from a bottle sterilized by heat would be exposed to a BPA dose of about four percent of an amount shown to affect animals in a laboratory. While this may seem to be a low exposure risk, safety limits for infant exposure are often set as low as 0.1 percent of the level demonstrated to harm laboratory animals. By this standard, Consumer Reports concluded that infants who used the type of bottles tested could be exposed to a BPA dose 40 times higher than the level frequently derived using conservative methods to determine safe levels. Consumer Reports concluded on the basis of its tests and the heightened concern expressed by scientists over the sensitivity of infants to the estrogen-like effects of chemicals such as BPA that the U.S. Food and Drug Administration should re-evaluate the safety of BPA. *See* Consumers Union, *Baby Alert: New Findings About Plastics,* Consumer Reports, 64:28, May, 1999.

25.     In 2003, Norwegian researchers conducted a study and detected BPA leaching in 12 polycarbonate baby bottles subjected to simulated use (dishwashing, brushing and scrubbing, and boiling). The level of BPA found in liquids in these bottles exceeded 8 micrograms per liter. *See* C. Brede et al, *Increased Migration Levels of Bisphenol A from Polycarbonate Baby Bottles After Dishwashing, Boiling and Brushing*, Food Additives and Contaminants 20(7): 684-9, 2003.

26.     After the Norwegian study, the Environment California Research and Policy Center selected five of the most popular baby bottles, including bottles manufactured by Defendants Avent, Gerber, Handi-Craft and Playtex, and performed its own study ("California Study") to determine whether BPA is released into liquids in these bottles. This study confirmed

the findings of the Norwegian study and reported that "all five bottles leached BPA at varying levels in the same range detected in the Norway study." BPA leaching was found at levels determined to have harmful effects on laboratory animals in numerous studies. The California Study detected 7.74 – 10.07 ppb (parts per billion) of BPA in the Avent (Natural Feeding) baby bottle, 6.07 – 7.07 ppb of BPA in the Dr. Brown's (Natural Flow) baby bottle, 4.58-5.79 ppb of BPA in the Gerber (Premium Feeding System) baby bottle and 4.58 – 5.79 ppb in the Playtex (VentAire) baby bottle (Exhibit B).

27.     As indicated in the California Study, children are particularly susceptible to the harmful effects of endocrine disrupters like BPA. However, many of the problems associated with these chemicals, including BPA, cannot be recognized until years after exposure. Health problems caused by BPA can occur over a child's lifespan; thus, it is difficult to determine whether or when health issues related to childhood exposure to BPA will manifest. Limitations on childhood exposure to products containing BPA are critical to prevent or minimize harm to children's intellectual abilities and growth, as well as potential for exposure-related disease. *See* Exhibit B.

28.     The United States Centers for Disease Control performed a study in 2003-2004 that confirmed the results of the California Study and observed BPA levels between 0.1 and 9 ppb, which equal or exceed concentrations known to cause adverse effects in laboratory experiments. *See* A. Calafat et al., *Urinary Concentrations of Bisphenol A and 4-Nonylphenol in a Human Reference Population*, Environmental Health Perspectives 113(4): 391-395, April 2005.

29.     A paper published in 2007 described a study that evaluated whether BPA migrated into water stored in new or used high-quality polycarbonate bottles. BPA was found to

COMPLAINT - Page 10

migrate from polycarbonate water bottles at rates ranging from 0.20 ng/h to 0.79 ng/h. Exposure to boiling water increased the rate of BPA migration by up to 55-fold. *See* H. Le et al., *Bisphenol A is Released from Polycarbonate Drinking Bottles and Mimics the Neurotoxic Actions of Estrogen in Developing Cerebellar Neurons*, Toxicology Letters 176(2):149-56, Jan. 30, 2008.

30.     Some researchers have concluded that BPA behaves like a female sex hormone, similar to estrogen.   This research, including numerous tests on lab mice, has shown that embryonic and infant mice exposed to small amounts of BPA tend to be obese as adults and that BPA exposure could be a cause of the current rise of human obesity.   BPA can also cause increased prostate size, decreased sperm production and increased aggression in male mice. Leaching of BPA into food and beverages held in polycarbonate plastic containers has led to widespread human exposure posing a threat to human health.   In his commentary published in 2005, Professor Frederick vom Saal documented a large number of recently published studies showing that the exposure of experimental animals to "low" doses of BPA, still resulting in tissue levels within and even below the range of current human exposure, has been related to adverse effects. *See* Frederick S. vom Saal and Claude Hughes, *An Extensive New Literature Concerning Low-dose Effects of Bisphenol-A Shows the Need for a New Risk Assessment*. ENVIRONMENTAL HEALTH PERSPECTIVES, August, 2005, at 926 (Exhibit C).

31.     As of December 2004, 94 of 115 published in vivo studies concerning low dose effects of BPA reported significant effects. Professor Frederick vom Saal and his colleagues also expressed the belief that a new risk assessment for BPA is overdue based on conclusions that the extensive new literature reports adverse effects in animals at doses below the current reference dose; that the high rate of leaching of BPA from food and beverage containers has lead to

COMPLAINT - Page 11

widespread human exposure; that the median BPA level in human blood and tissues, including in human fetal blood, is higher than the level that causes adverse effects in mice; and that recent epidemiologic evidence indicates that BPA is related to disease in women. *See* Exhibit C.

32.     As summarized by Professor Frederick vom Saal and his colleagues, studies have associated BPA with changes in the brain, pancreas, thyroid function, hormone levels and behavior, prostate and breast cancer, lowered sperm count, early puberty, as well as increased insulin secretion, which can lead to diabetes, obesity, and hypertension. Despite growing and extensive scientific literature reporting adverse health effects from BPA exposure at very low doses, the U.S. chemical industry, including Defendants, continue to resist the idea that BPA is dangerous. *See* Exhibit C.

33.     In 2003, researchers discovered that BPA can cause chromosomes to sort incorrectly, even at very low doses. This effect can cause serious genetic health problems, including birth defects such as Down Syndrome and miscarriages. Patricia A. Hunt, et al, *Bisphenol-A Exposures Causes Meiotic Aneuploidy in the Female Mouse*, CURRENT BIOLOGY, April 1, 2003, at 546 (Exhibit D). *See also,* Daniel J. DeNoon, *Danger in Plastic Baby Bottles? Common Plastics Chemical Linked to Genetic Damage,* WebMD Medical News, March 31, 2003, *available at http://www.webmd.com/baby/news/20030331/danger-in-plastic-baby-bottles* (last visited June 4, 2008).

34.     Other studies indicating BPA's threat to human health include the following:

•      C. Gupta, *Reproductive Malformation of the Male Offspring Following Maternal Exposure to Estrogenic Chemicals*, Proceedings of the Society for Experimental Biology and Medicine 224:61-68 (2000) (BPA linked to

low sperm counts, hyperactivity, early puberty, obesity, small testes size, and enlarged prostates);

o    B.S. Rubin et al, *Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels*, Environmental Health Perspectives 109:675-680 (2001) (BPA exposure makes rodents grow larger and effects persist long after exposure);

o    H. Masuno et al, *Bisphenol A in Combination with Insulin Can Accelerate the Conversion of 3T3-L1 Fibroblasts to Adipocytes*, Journal of Lipid Research, 43:676-684, May 2002 (BPA exposure can trigger two main processes in developing obesity);

o    K. Sakurai et al, *Bisphenol A Affects Glucose Transport in Mouse 3T3-F442A Adipocytes*, British Journal of Pharmacology, 141:209-214 (2004) (confirming findings of Masuno, showing that BPA increased uptake of sugar into fat cells);

o    N.J. MacLusky, T. Hajszan, and C. Leranth, *The Environmental Estrogen Bisphenol A Inhibits Estradiol-Induced Hippocamopal Synaptogenesis*, Environmental Health Perspectives, 13:675-679 (2005) (in some areas of brain, BPA can inhibit activity of estrogen);

o    W.E. Barlow et al, *Prospective Breast Cancer Risk Prediction Model for Women Undergoing Screening Mammography*, Journal of the National Cancer Institute, 17:Vol. 98, 6 September 2006 (BPA altered growth of mammary tissues to increase risk of breast cancer);

○ M. Sakaue et al, *Bisphenol A Affects Spermatogenesis in the Adult Rat Even at a Low Dose*, Journal of Occupational Health, 43:185-190 (2001) (BPA reduced sperm count in rats even when exposure is after puberty, "... environmental endocrine disrupters such as BPA alter spermatogenesis in a linear manner in a dose range which is perhaps relevant to the daily level of exposure in man.")

35.     In 2006, a group of 38 leading BPA scientists held a meeting sponsored by the National Institutes of Health to examine the relationship between BPA and the negative trends in human health observed in recent years, including increases in abnormal penile/urethra development, early sexual maturation in females, increased neuron-behavioral problems such as ADHD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm count, and increases in hormonally-mediated concerns.  These scientists concluded that extensive evidence documents that negative health outcomes may not manifest until long after BPA exposure during development takes place.  Developmental effects are irreversible and result from low-dose exposures during brief sensitive periods in development even though BPA may not be detected when the health problem is expressed.  Furthermore, the scientists' findings indicate that studies of acute effects of high doses, relied upon by industry to defend the use of BPA, are not particularly relevant in considering effects on humans.  *See Chapel Hill Bisphenol A Expert Panel Consensus Statement: Integration of Mechanisms, Effects in Animals and Potential to Impact Human Health at Current Levels of Exposure* (Exhibit E).

36.     The Environmental Working Group ("EWG"), a non-profit organization founded in 1993, which conducts environmental investigations about toxins and other issues, The EWG has called into serious question the objectivity and validity of work done to evaluate BPA risks

COMPLAINT - Page 14

by groups sponsored by the National Institute of Environmental Health Sciences ("NIEHS"). The EWG has found the NIEHS research to be flawed by conflicts of interest, and responsible for the federal government's failure to adequately regulate BPA. *See* Letter from Anila Jacob, Senior Scientist for EWG, to Dr. Michael Shelby, Director of NIEHS Center for the Evaluation of Risks to Human Reproduction (Jan, 25, 2008) (critiquing results from NIEHS Bisphenol A (BPA) Expert Panel Report), *available at http://www.ewg.org/files/BPAletter20080125.pdf* (last visited June 4, 2008).

37. Similarly, U.S. Representative Henry A. Waxman and members of the House Committee on Oversight and Government Reform have been critical of the work of these same groups and of EPA's failure to test and control endocrine disrupting substances such as BPA. *See* Letter from Henry Waxman, Chair of House Committee on Oversight and Government Reform, and Barbara Boxer, Chair of Senate Environment and Public Works Committee, to David Schwartz, Director of NIEHS (Feb, 28, 2008) (requesting a briefing regarding allegations that NIEHS Bisphenol A (BPA) Expert Panel Report was biased), *available at http://oversight.house.gov/documents/20070228174926-82628.pdf* (last visited June 4, 2008).

38. On November 26, 2007, the National Toxicology Program's Center for the Evaluation of Risks to Human Reproduction released an Expert Panel Report on the Reproductive and Developmental Toxicity of BPA. That report, authored by a twelve-member independent panel made up of government and non-government scientists, expressed some concern that exposure of children to BPA causes neural and behavioral effects, and minimal concern that BPA exposure in children accelerates puberty. *See* Center for the Evaluation of Risks to Human Reproduction, *NTP-CERHR Expert Panel Report on the Reproductive and Developmental Toxicity of Bisphenol A*, Nov. 26, 2007, *available at*

COMPLAINT - Page 15

*http://cerhr.niehs.nih.gov/chemicals/bisphenol/BPAFinalEPVF112607.pdf* (last visited June 4, 2008).

39.     As referenced above, on April 14, 2008, the National Toxicology Program, a division of the National Institutes of Health, released a Draft NTP Brief on BPA, with a finding that BPA is potentially dangerous to human development and reproduction. Specifically, the Draft NTP Report concluded that the scientific evidence supports a finding of some concern for exposure to BPA in fetuses, infants and children, as laboratory animal studies have reported that low level exposure can cause changes in behavior, in the brain, prostate gland, mammary gland, and the age at which females attain puberty. In addition, the Draft NTP Brief noted that studies with laboratory animals have shown that exposure to high dose levels of BPA during pregnancy and lactation can reduce survival, birth weight, growth of offspring early in life, and delay the onset of puberty. *See* Exhibit A.

40.     In 2007, the Milwaukee Journal Sentinel investigated the use of chemicals, in particular, endocrine disruptors, reviewing over 250 studies from the last 20 years, thousands of regulatory and industry documents, and interviewing over 100 experts. In its article, the newspaper exposed that although no action had been taken under a federal regulatory program developed for the testing of endocrine disruptors, such as BPA, millions of dollars had been spent on the program. In a follow up article addressing BPA specifically, the newspaper examined 258 studies, with the majority finding BPA to be harmful. The newspaper also noted that the National Toxicology Program Report discussed above is the first time a federal agency has expressed that BPA poses a potential harm to humans. *See* S. Rust et al., *Are Your Products Safe? You Can't Tell.* Milwaukee Journal Sentinel, Nov. 25, 2007; S. Rust et al., *WARNING: The*

*Chemical Bisphenol A Has Been Known to Pose Severe Health Risks to Laboratory Animals. AND THE CHEMICAL IS IN YOU.* Milwaukee Journal Sentinel, Dec. 2, 2007. (Exhibit F)

41.    The Milwaukee Journal Sentinel articles were also the focal point of a recently televised PBS program discussing the harmful effects of BPA in humans. *See Exposé on Bill Moyers' Journal: Chemicals in Our Food* (PBS television broadcast May, 23, 2008), *available at* http://www.pbs.org/moyers/journal/05232008/profile.html)          (transcript          on          file          at http://www.pbs.org/moyers/journal/05232008/transcript2.html).  (Exhibit G)

42.    Following the release of the Draft NTP Report, Senator Charles Schumer of New York introduced bill S. 2928, known as the "BPA-Free Kids Act of 2008," on April 29, 2008. The bill seeks to ban any children's product that contains a detectable amount of BPA, which will be treated as a banned hazardous substance under the Federal Hazardous Substances Act. On May 20, 2008, Senator Schumer, along with Representatives Hilda Solis and Henry Waxman of California, introduced bill H.R. 6100, known as the "Kid Safe Chemicals Act" to further amend the Federal Hazardous Substances Act.

43.    In addition, retailers have begun pledging to remove baby bottles containing BPA from their shelves.  To date, Wal-Mart, Toys "R" Us, Babies "R" Us, REI, as well as Defendants NNIC and Playtex, have all issued statements announcing that they will phase out baby bottles and training cups containing BPA. Retailer Whole Foods Market, Inc. ceased selling these products entirely in early 2006.

44.    On April 19, 2008, the Canadian Health Ministry released a Risk Management Scope for Phenol, 4.4' (methylethylidene)bis-(BPA), including a Draft Screening Assessment Report Conclusion.  The Draft Report proposed that BPA is toxic to human health and the environment as defined in the Canadian Environmental Protection Act, and opened a sixty day

comment period to determine whether BPA meets the criteria under section 64 of CEPA 1999,
such that the Canadian government will be in a position to move to prohibit the importation, sale
and advertising of all polycarbonate baby bottles. *See* Environment Canada and Health Canada,
*Draft Screening Assessment for Phenol, 4,4′ -(1-methylethylidene)bis- (Bisphenol A)*, Chemical
Abstracts Service Registry Number 80-05-7, April 2008, *available at*
*http://www.ec.gc.ca/substances/ese/eng/challenge/batch2/batch2_80-05-7_en.pdf* (last visited
June 4, 2008).

45.    Meanwhile, Canadian retailers are pulling water bottles and food storage
containers off the shelves because Health Canada, the Canadian equivalent of the United States'
FDA, is considering labeling the chemical as a dangerous substance. Jacob Goldstein, *Worries
Grow Over Bisphenol A in Plastics,* Wall Street Journal Health Blog, April 16, 2008, *available
at* *http://blogs.wsj.com/health/2008/04/16/worries-grow-over-bisphenol-a-in-*
*plastics/?mod=WSJBlog&mod=WSJBlog* (last visited June 4, 2008).

46.    After the release of the American and Canadian reports, the Israel Health Ministry
announced guidelines for safe use of baby bottles containing BPA on April 30, 2008. The Israel
Health Ministry advised using only baby bottles that were without scratches and less than a year
old, and warned not to microwave or pour boiling or very hot water into baby bottles for making
beverages or hot foods, as that may cause BPA to leach from the plastic. *See* Judy Siegel-
Itzkovich, *Health Ministry Issues Guidelines on Baby Bottles*, Jerusalem Post, April 30, 2008,
*http://www.jpost.com/servlet/Satellite?pagename=JPost%2FJPArticle%2FShowFull&cid=1208*
*870534621* (last visited June 4, 2008).

**B.  DEFENDANTS MARKET AND SELL THE HAZARDOUS BABY PRODUCTS DESPITE THE DANGERS TO INFANTS AND YOUNG CHILDREN**

47.    Defendants' Hazardous Baby Products make no mention or disclosure of the real or potential dangers of BPA exposure. They include no warnings or information about BPA on the packaging or in the marketing of Hazardous Baby Products. In fact, from looking at the product packages created, marketed, and distributed by the Defendants, it is impossible for a parent consumer to determine whether an infant feeding product contains BPA.  Defendants keep parents and consumers ignorant of the potential dangers of BPA exposure.  Defendants should not be permitted to continue imposing risks on children and future generations while profiting from the ignorance of its customers. The risk of harm outweighs the utility of a highly dangerous and controversial chemical component in the manufacture of plastic baby bottles and cups.

48.    Defendants engaged in long-term advertising campaigns designed to market Hazardous Baby Products to new parents and other caregivers. Defendants were aware that the advertising concealed information that was material to the caregivers' purchasing decision, and its marketing was false and deceptive in claiming its products to be safe and healthful.

49.    Most Defendants claim that their products are uniquely designed to support the baby's health.  For example, Defendant Avent claims its Airflex Natural Feeding bottle contains an "Airflex valve", which mimics "baby's natural feeding rhythm" and "can help reduce overeating and spit up" and colic.  Defendant Gerber markets its brand with a "Gerber Start Healthy Stay Healthy" slogan and a claim that its products "support healthy growth and development." One line of products tout docosahexaenoic acid, a polyunsaturated omega-3 fatty acid ("DHA"),to help "support brain and eye development."  Certainly Gerber knows that parents would avoid products that impair such development.  Defendant Handi-Craft claims the Dr. Brown's Natural Flow bottle has a "unique internal vent" that helps reduce colic and also

COMPLAINT - Page 19

reduces the build up of fluid in baby's ears. Defendant Playtex claims its First Sipster® cup is designed by a "feeding specialist" and that its product "help[s] proper oral development."

50. Defendants' packaging similarly touts the healthfulness of its Hazardous Baby Products. For example, Avent labels its BPA products as "Natural Feeding", and Handi-Craft labels its BPA products with the slogan "Dr. Brown's Natural Flow." However, these products have a serious defect which can impair a child's health - BPA - which is not even mentioned on the package. Certainly Defendants know that if parents were made aware of the hazards they would avoid products that pose serious risks to the growth and development of their young children.

51. Most Defendants claim that their products are "clinically-proven" to support the baby's health in some manner. For example, Defendant Avent states its Natural Feeding bottles, which contain BPA, are "Clinically Proven to Reduce Colic". Defendant Playtex states that one line of its BPA Baby Products are "Clinically Proven" to "Significantly Reduce[] Gas, Spit-up & Colic," to "Help[] Prevent Ear Infections" and "Reduce[] Air Ingestion." Consumers rightfully believe that they would be informed if other clinical trials indicated a serious product defect, such as that which exists in Defendants' BPA Baby Products, or that such defects would be fixed before the product is sold.

52. Defendants' marketing is also designed to create a trust relationship. For example:

- Defendant Avent claims that "Choosing Philips AVENT means you have the assurance of superior quality products, designed with you and your baby's needs in mind. Through extensive research and clinical trials, Avent products work effectively together to promote baby's well-being".

- Defendant Gerber, using the slogan "Anything for Baby", claims their "commitment to the well-being of babies carries over into everything [they] do." Defendant Gerber's "Graduates" line of training cups is "dedicated to helping you provide your little one with good nutrition." Defendant Gerber also claims to be "committed to promoting good nutrition and healthy habits for children" and to be "one of the most trusted names in baby food and baby care for four generations."

- Defendant Handi-Craft Company markets the Dr. Brown's Natural Flow bottle as a "Gold Medical Design Excellence Awards – 2000 Winner" and claims that the feeding bottle is "Physician Designed." Furthermore, by manufacturing and marketing a bottle that creates "positive pressure flow, just like breastfeeding," Handi-Craft specifically targets its "Dr. Brown's" products to breastfeeding parents whom it knows, or should know, are particularly sensitive to health concerns, and would not buy Hazardous Baby Products, thereby placing their children at risk for developmental, neural and reproductive problems.

- Defendant Playtex states that "We know there is nothing more important to you than your baby's development."

53.    Upon information and belief, Defendants were aware of the scientific studies discussed above and have conducted their own independent studies that have confirmed the fact that their products leach BPA into food and beverages under normal, everyday use.

54.    Defendants are aware that there are alternative means for manufacturing its baby products and now manufacture and market BPA-free products as part of their product line. Most Defendants have even begun to manufacture and promote alternative BPA-free products. Yet, to increase profits, Defendants Avent, Gerber, Handi-Craft and Playtex continue to manufacture

and market Hazardous Baby Products without full disclosure of their risks. In addition to its Hazardous Baby Products containing BPA, Handi-Craft now offers BPA-free baby bottles made of glass and polypropylene, for which they charge a significant premium. *See http://www.handi-craft.com/* (showing three types of baby bottles, last visited June 4, 2008). As of May 20, 2008, Amazon.com sells the Dr. Brown's brand polypropylene bottles for approximately $40 for a set of three while Dr. Brown's BPA-laced bottles are on sale, five bottles for $16.27. Playtex and Gerber offer baby bottles and training cups made of polypropylene and/or polyethylene, but continue to manufacture and sell their Hazardous Baby Products which contain BPA. NNIC plans to eliminate BPA products entirely and offers a training cup made of copolyester. *See http://www.nalgene-outdoor.com/technical/bpaInfo.html* (stating NNIC's intention to phase out its BPA products "in response to consumer demand for [BPA-free] products", last visted June 4, 2008).

55.     Having held themselves out as trustworthy sources of safe and healthy products, Defendants had a duty to disclose facts regarding the health risks their products imposed. This included the fact that their Hazardous Baby Products contained BPA that would leach into food and beverages under normal, everyday use, and the serious health risks posed by such BPA-exposure..

56.     Defendants have misrepresented the risks of harm associated with its Hazardous Baby Products and have failed to make honest disclosures to Plaintiff and other similarly situated consumers. Plaintiff, and others similarly situated, relied upon the Defendants' misrepresentations and lack of disclosure and have sustained injuries as a result thereof.

57.     These studies confirm that Defendants' Hazardous Baby Products contain levels of BPA that are potentially unsafe and could threaten the health and safety of children, including

COMPLAINT - Page 22

the children of and in the care of members of the Class. Thus, members of the Class reasonably may feel compelled to discontinue the use of such products causing them economic harm.

## V. CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this Illinois State class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff brings this action on behalf of herself and all members of a Class comprised of all persons who, during the period May 2003 through the present purchased and/or acquired the Hazardous Bottles, Cups, and Containers.

59.    The Class is so numerous that joinder of all members is impracticable. Plaintiff believes that the total membership of the Class numbers in the thousands.

60.    There are many common questions of law and fact involving and affecting the parties to be represented.    These common questions of law or fact predominate over any questions affecting only individual members of the Class Common questions include, but are not limited to, the following:

a.    Whether the Hazardous Baby Products are defective;

b.    Whether Defendants negligently manufactured, distributed, marketed, tested and/or sold the Hazardous Baby Products;

c.    Whether there is an increased risk of serious health problems as a result of the BPA in the Hazardous Baby Products;

d.    Whether Defendants conducted adequate studies and quality tests of their Hazardous Baby Products to determine whether and to what extent the Hazardous Baby Products were contaminated with BPA or leached BPA following exposure to heat or liquids;

e.    Whether Defendants engaged in deceptive and unfair business and trade practices;

COMPLAINT - Page 23

f.      Whether Defendants knowingly or negligently concealed or omitted material information concerning the safety of the Hazardous Baby Products;

g.      Whether the Class is entitled to injunctive relief; and

h.      Whether Defendants falsely and fraudulently misrepresented in their advertisements and promotional materials, and other materials the safety of the Hazardous Baby Products.

61.      Plaintiff's claims are typical of the claims of the respective Class she seeks to represent, because Plaintiff and all members of the proposed Class have purchased Hazardous Baby Products and/or are at risk of serious health problems.

62.      Plaintiff will fairly and adequately protect the interests of the Class, and has retained attorneys experienced in class actions and complex litigation as her counsel.

63.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief.

64.      Plaintiff avers that the prerequisites for class action treatment apply to this action and that questions of law or fact common to the Class predominate over any questions affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action. Plaintiff further states that the interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of this Class will not be difficult.

## VI.   COUNT ONE
## BREACH OF IMPLIED WARRANTY

65.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

COMPLAINT - Page 24

66.     The Uniform Commercial Code § 2-314, codified at 810 Ill. Comp. Stat. 5/2-314, provides that unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

67.     Defendants manufactured, marketed and sold the Hazardous Baby Products and represented that the Hazardous Baby Products were fit for use by children. Contrary to such representations, Defendants failed to disclose that the Hazardous Baby Products were defective as they contained BPA that could leach into liquids contained by the Hazardous Baby Products.

68.     At all times, Illinois and the following 48 states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability: Ala. Code § 7-2-314; Alaska Stat. §45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. St § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. C. § 2-314; D.C. Code § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; Ind. Code Ann. § 26-1-2-314; Iowa Code Ann. § 554.2314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. art. § 2520; 11 Me. Rev. Stat. Ann. § 2-314; Md. Code Ann. § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. U.C.C § 104.2314; N.H. Rev. Ann. § 382-A:2-314; N.J. Stat. Ann. § 12A:2-314; N.M. Stat. Ann. § 55-2-314; N.Y. U.C.C. Law §2-314; N.C. Gen. Stat. Ann. § 25-2-314; N.D. Stat § 41-02-314; Ohio Rev. Code Ann. § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. Stat. Ann. § 2314; R.I. Gen. Laws § 6A-2-314; S.C. Code Ann. § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code Ann. § 47-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Utah Code Ann. § 70A-2-314; Va.

Code § 8.2-314; Vt. Stat. Ann. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A 2-314; Wis. Stat. Ann. § 402.314 and Wyo. Stat. § 34.1-2-314.

69.     As designers, manufacturers, producers, marketers and sellers of Hazardous Baby Products, each Defendant is a "merchant" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

70.     The Hazardous Baby Products are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

71.     As merchants of the Hazardous Baby Products, Defendants knew that purchasers relied upon them to design, manufacture and sell baby feeding products that were reasonably safe and would not endanger their children's health.

72.     Defendants designed, manufactured and sold Hazardous Baby Products to parents of young children and they knew that such products would be used by caregivers of young children to feed them.

73.     At the time that Defendants designed, manufactured, sold and/or distributed the Hazardous Baby Products, Defendants knew the purpose for which the bottles, cups, and containers were intended and impliedly warranted that they were of merchantable quality; were free of hazardous substances; were free of manufacturing defects such as BPA contamination; were free of design defects; and were safe and fit for their ordinary purpose - as food or drink vessels for young children.

74.     Defendants breached their implied warranties in connection with their sale of Hazardous Baby Products to Plaintiff and members of the Class. The Hazardous Baby Products were not safe and fit for their ordinary purpose and intended use as children's feeding products, and were not free of defects, such as BPA contamination which at low doses can lead to cancers,

impaired immune function, early onset of puberty, obesity, diabetes, and hyperactivity, among other problems.

75.     As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and other members of the Class have been injured and have suffered damages, including, but not limited to the value of the Hazardous Baby Products had they been safe and fit for their ordinary purposes and an increased risk of serious health problems.

76.     Plaintiff and the Class are entitled to judgment against the Defendants for actual damages in the form of restitution, litigation costs and attorneys fees.

## VII.   COUNT TWO
## BREACH OF EXPRESS WARRANTY

77.     Plaintiff repeats and alleges each and every allegation contained above as if fully set forth herein.

78.     The Uniform Commercial Code § 2-313, codified at 810 Ill. Comp. Stat. 5/2-313 provides that an affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the promise.

79.     As detailed above, Defendants manufactured, marketed and sold the Hazardous Baby Products and represented that the Hazardous Baby Products were safe and fit for use by children. Further, Defendants represented that the Hazardous Baby Products were free from hazardous substances including BPA.

80.     Defendants expressly warranted that the Hazardous Baby Products were manufactured to conform with all safety requirements under U.S. federal and other applicable laws and regulations, industry developed standards, including the ASTM Standards, and product

specific standards, and that they were periodically reviewed and approved by independent safety testing laboratories.

81.    The Hazardous Baby Products did not conform to these express representations because the Hazardous Baby Products were not safe for children, and were defective, because they contained BPA.

82.    At all times, Illinois and the following 48 states listed below, including the District of Columbia have codified and adopted the provisions of the Uniform Commercial Code governing the express warranty of merchantability: Ala. Code 1975 § 7-2-313; Alaska Stat. § 45.02.313; Ariz. Rev. Stat. § 47-2313; Ark. Stat. § 4-2-313; Cal. Com. Code § 2313; Colo. Rev. Stat. Ann. § 4-2-313; Conn. Gen. Stat. Ann. § 42a-2-313; 6 Del. C. § 2-313; D.C. Stat. § 28:2-313; Fla. Stat. Ann. § 672.313; Ga. Code Ann. § 11-2-313; Haw. Rev. Stat. § 490:2-313; Idaho Code § 28-2-313; Ind. Code Ann. § 26-1-2-313; Iowa Code Ann. § 554.2313; Kan. Stat. Ann. § 84-2-313; Ky. Rev. Stat. Ann. § 355.2-313; 11 Me. Rev. Stat. Ann. § 2-313; Md. Code Ann. § 2-313; Mass. Gen. Laws. Ch. 106 § 2-313; Mich. Comp. Laws Ann. § 440.2.313; Minn. Stat. Ann. § 336.2-313; Miss. Code Ann. § 75-2-313; Mo. Rev. Stat. § 400.2-313; Mont. Code Ann. § 30-2-313; Nev. Rev. Stat. U.C.C § 104.2313; N.H. Rev. Ann. § 382-A:2-313; N.J. Stat. Ann. § 12A:2-313; N.M. Stat. Ann. § 55-2-313; N.Y. U.C.C. Law 2-313; N.C. Gen. Stat. Ann. § 25-2-313; N.D. Stat. § 41-02-313; Ohio Rev. Code Ann. § 1302.26; Okla. Stat. tit. 12A § 2-313; Or. Rev. Stat. § 72.3130; 13 Pa. Stat. Ann. § 2313; R.I. Gen. Laws § 6A-2-313; S.C. Code Ann. § 36-2-313; S.D. Stat. § 57A-2-313; Tenn. Code Ann. § 47-2-313; Tex. Bus. & Com. Code Ann. § 2-313; Utah Code Ann. §70A-2-313; Va. Code § 8.2-313; Vt. Stat. Ann. 9A § 2-313; Rev. Code Wash. Ann. § 62A.2-313; W. Va. Code § 46-2-313; Wis. Stat. Ann § 402.313; Wyo. Stat. § 34.1-2-313.

83. At the time that Defendants designed, manufactured, sold and/or distributed the Hazardous Baby Products, Defendants knew the purpose for which the Hazardous Baby Products were intended and expressly warranted that they were safe and fit for use by young children.

84. Plaintiff and other members of the Class relied upon the skill, superior knowledge and judgment of the Defendants to sell baby feeding products that were reasonably safe for use by young children and their caregivers. Until investigative journalists published recent studies by scientists questioning the safety of the products, Plaintiff could not have known about the risks associated with the Hazardous Baby Products. Plaintiff had no independent means of knowing that the baby feeding products were not safe or fit for their ordinary purpose and intended use, and were not free of manufacturing defects, but instead were potentially laden with BPA, which is a hazardous substance because of its danger to young children.

85. Defendants breached their express warranties in connection with the sale of the Hazardous Baby Products to Plaintiff and other members of the Class.

86. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and other members of the Class have suffered damages, including, but not limited to, an increased risk of serious health problems and the value of the Hazardous Baby Products had they been safe and fit for their ordinary purposes.

87. Plaintiff and the Class are entitled to judgment against the Defendants for actual damages in the form of restitution, litigation costs and attorneys fees.

## VIII.  COUNT THREE
## CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

88. Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

COMPLAINT - Page 29

89.     Defendants' concealment, misbranding and non-disclosure of BPA as alleged herein constitutes unlawful, deceptive and unfair business acts within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act"), 815 Ill. Comp. Stat. 505/1 *et seq.*, and similar statutory enactments of other states (including consumer protection and consumer sales practices acts).

90.     Defendants have also violated the Act because in their commercial and business practices, they have used and/or employed practices prohibited by the Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2. Specifically, Defendants have: (1) represented that their Hazardous Baby Products are of a particular standard, quality or grade when they are of another; (2) advertised their Hazardous Baby Products with intent not to sell them as advertised; and/or (3) engaged in conduct which similarly creates the likelihood for confusion and misunderstanding.

91.     Defendants engaged in unfair and unlawful conduct to profit from sales of products containing BPA and acquired money or property as a result of these unlawful practices.

92.     Defendants' use of deceptive and unfair business acts or practices in marketing and/or selling their Hazardous Baby Products violates public policy and is substantially unethical, oppressive and injurious to consumers.

93.     In particular, Defendants' statements as to the safety and the healthfulness of their Hazardous Baby Products and their concealment and non-disclosure of the presence of BPA in its Hazardous Baby Products are unfair and deceptive and have the capacity to confuse, mislead or deceive consumers and members of the public. Such practice occurred in the conduct of trade or commerce; it affected the public interest; and such practice proximately caused injury to Plaintiff and members of the Class in their business and/or property.

COMPLAINT - Page 30

94.     Defendants knowingly concealed, suppressed and/or failed to disclose material facts with the intent that consumers would rely upon such concealment, misbranding, suppression or non-disclosure.

95.     Defendants' concealment, misbranding, suppression and non-disclosure and other acts described above continue to this day and present a threat to Plaintiff and members of the Class. Defendants' conduct also affects and threatens the public interest in other ways now unknown, but to be proven at trial.

96.     As a result of Defendants' concealment, misbranding, suppression and non-disclosure, Plaintiff and Class members have been harmed and continue to be harmed.

97.     Plaintiff and the Class are entitled to an injunction against Defendants' misleading and deceptive practices and a declaration that Defendants' actions constitute a violation of the consumer protection laws. In addition, Plaintiff and the Class are also entitled to judgment for actual damages sustained, as a result of Defendants' unfair and deceptive acts and practices, in the form of restitution, and reimbursements of litigation costs and attorneys fees.

## IX.     COUNT FOUR
## STRICT PRODUCTS LIABILITY – DEFECT IN DESIGN OR MANUFACTURE

98.     Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

99.     Defendants, as commercial suppliers of products containing BPA, have a duty to refrain from placing unreasonably dangerous products into the stream of commerce that are not fit for consumption or use which can cause injury to persons or property.

100.     Defendants breached that duty, and continue to breach that duty, by placing unreasonably dangerous products into the stream of commerce that are not fit for consumption or use which can cause injury to persons or property. Defendants' Hazardous Baby Products were

COMPLAINT - Page 31

unreasonably dangerous because they contained, and continue to contain, manufacturing and/or design defects.

101.  The unreasonably dangerous products Defendants placed into the stream of commerce reached consumers, including Plaintiff and the Class, without substantial changes in the condition in which they were supplied.

102.  Plaintiff and the Class were reasonably foreseeable users of Defendants' unreasonably dangerous products and used the unreasonably dangerous products in a foreseeable manner. As a result, Plaintiff and the Class have suffered significant damages which were caused directly and proximately by their use of Defendants' Hazardous Baby Products.

103.  Plaintiff and the Class are entitled to judgment against Defendants for their actual damages in the form of restitution, and reimbursement of litigation costs and attorneys fees.

## X. COUNT FIVE
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

104.  Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

105.  Defendants have placed unreasonably dangerous products that are not fit for consumption or use into the stream of commerce and which can cause injury to persons or property.

106.  Defendants have also failed to warn reasonably foreseeable users of these unreasonably dangerous products, including Plaintiff and the Class, of the known dangers associated with these products despite the fact that Defendants knew, or should have known, of the dangers associated with their unreasonably dangerous products. Even after Defendants became aware, or should have become aware, of the dangerous conditions of their products, they failed to investigate potential problems in a reasonable manner and failed to warn consumers of

COMPLAINT - Page 32

potential dangers, thereby allowing countless consumers to purchase the unreasonably dangerous products.

107. As a direct and proximate result of Defendants' actions, Plaintiff and the Class suffered significant damages.

108. Plaintiff and the Class are entitled to judgment against Defendants for their actual damages in the form of restitution, and reimbursement of litigation costs and attorneys fees.

### XI.    COUNT SIX
### BREACH OF CONTRACT

109. Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

110. Plaintiff and each member of the Class purchased Hazardous Baby Products from Defendants. A contract was created between Defendants and Plaintiff and each and every member of the Class.

111. By reason of the conduct described above, Defendants have uniformly breached their contracts with Plaintiff and members of the Class by: (a) failing to provide baby products that could safely be used by babies and infants; (b) failing to disclose that the goods purchased were not what Defendants represented them to be; (c) failing to act in good faith; (d) breaching warranties existing because of the contracts; and (e) such other actions now unknown but to be proven at trial.

112. As a proximate result of the aforementioned wrongful conduct and breach committed by Defendants, Plaintiff and members of the Class have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

## XII.   COUNT SEVEN
## UNJUST ENRICHMENT

113.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.   At all times relevant hereto, Defendants designed, manufactured, produced, marketed and/or sold Hazardous Baby Products that contained BPA. BPA is a developmental, neural, and reproductive toxicant that scientists have linked at very low doses of exposure to cancers, impaired immune function, early onset of puberty, obesity, diabetes, and hyperactivity, among other problems.

115.   Plaintiff and members of the Class conferred upon Defendants benefits that were non-gratuitous without knowledge that the Hazardous Baby Products they purchased and used have exposed their young children to potential adverse health effects resulting from repeated exposure to BPA. Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendants' unconscionable wrongdoing, Plaintiff and members of the Class were not receiving products of high quality, nature, fitness or value that had been represented by Defendants and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable. Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Plaintiff and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

### XIII.  COUNT EIGHT
### FRAUDULENT MISREPRESENTATION

116.    Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

117.    Defendants, with knowledge and/or belief of the falsity of their statements, misrepresented and concealed from Plaintiff, the Class and consumers, the true nature of their Hazardous Baby Products.

118.    These representations were knowingly made to Plaintiff, potential customers and the general public through uniform misbranding, concealment and non-disclosure, through mass media and point-of-sale advertising, and through other information prepared or disseminated by Defendants. Defendants at all times knew that Plaintiff and Class relied upon the labeling and lack of labeling provided by Defendants. Defendants' concealment, misbranding and non-disclosure were intended to influence consumers' purchasing decisions and were done with intentional disregard for the rights of consumers.

119.    As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### XIV.  COUNT NINE
### NEGLIGENT MISREPRESENTATION

120.    Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

121.    Defendants have a duty to communicate accurate information to Plaintiff.

122.    Defendants breached that duty, and continue to breach that duty, in their failure to disclose the potential risks associated with the use of their Hazardous Baby Products and/or

accurately disclose available research discussing BPA containing products, despite awareness that information is available.

123.   Defendants negligently and/or recklessly misrepresented and concealed from the Plaintiff, the Class and consumers, the true nature of their Hazardous Baby Products.

124.   These representations were negligently or recklessly made to Plaintiff, potential customers and the general public through uniform misbranding, concealment and non-disclosure, through mass media and point-of-sale advertising, and through other information prepared or disseminated by Defendants. Defendants at all times knew that Plaintiff and Class relied upon the labeling and lack of labeling provided by Defendants. Defendants' concealment, misbranding and nondisclosure were intended to influence consumers' purchasing decisions and were done with reckless disregard for the rights of consumers.

125.   As a direct and proximate result of Defendants breaching this duty, and their misrepresentations, omissions and concealments, Plaintiff and Class members have been damaged in an amount to be proven at trial.

## XV.   COUNT TEN
## DECLARATORY AND INJUNCTIVE RELIEF

126.   Plaintiff incorporates by reference all previous paragraphs as if fully alleged herein.

127.   Plaintiff and Class members are entitled to declaratory relief establishing that Defendants are strictly liable for design and manufacturing defects and failure to warn, have engaged in unfair and deceptive practices, and that their conduct constitutes negligent misrepresentation and concealment, breach of contract and warranty, and that Defendants were thereby unjustly enriched.

COMPLAINT - Page 36

128.    Plaintiff and Class members are entitled to injunctive relief forcing Defendants to permanently halt the wrongful conduct asserted herein, and remedying past concealment and non-disclosure with new disclosures and other measures.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, prays for judgment against Defendants as follows:

1.     An order certifying that this action, involving Plantiff and the Class against Defendants Avent, Gerber, Handi-Craft, NNIC and Playtex, be maintained as a nationwide class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her undersigned counsel to represent the Class;

2.     For economic, compensatory, and general damages on behalf of all members of the Class;

3.     For an award of actual damages in the form of restitution;

4.     For disgorgement of ill gotten gains as set forth herein;

5.     For declaratory and injunctive relief as set forth herein;

6.     For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action, based upon the creation of a common fund recovery and under the consumer protection act, and based upon other theories and statutory bases.

7.     For such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 12th day of June, 2008.

KELLER ROHRBACK LLP.


By: /s/ Lynn Lincoln Sarko


FUTTERMAN HOWARD WATKINS WYLIE
& ASHLEY, CHTD.
Charles R. Watkins
John R. Wylie
Ronald L. Futterman
122 S. Michigan Ave., Suite 1850
Chicago, IL 60603
Telephone: (312) 427-3600
Facsimile: (312) 427-1850

KELLER ROHRBACK LLP.
Lynn Lincoln Sarko
Juli E. Farris
Gretchen Freeman Cappio
Laura R. Gerber
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ELIZABETH BANSE, *on behalf of herself and all other similarly situated persons,*<br><br>     Plaintiffs,<br><br>    v.<br><br>AVENT AMERICA, INC., *on behalf of itself and on behalf of a Defendant Class of producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A*<br><br>     Defendants. | FILED: MAY 6, 2008<br>**Case No.** 08CV2604     TG<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>JUDGE COAR<br>MAGISTRATE JUDGE DENLOW |

Plaintiff Elizabeth Banse ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint (the "Complaint") and alleges upon personal knowledge matters pertaining to herself and her own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by her counsel:

### I.    SUMMARY OF THE ACTION

1.    This is a nationwide class action lawsuit brought on behalf of Plaintiff and other similarly situated individuals (the "Plaintiffs" and the "Plaintiff Class") against Avent America, Inc. ("Defendant Avent"), individually, and as the representative of a Defendant class (the "Defendants" and the "Defendant Class") comprised of all entities which produce, manufacture, and/or otherwise distribute polycarbonate plastic bottle products containing the industrial

chemical Bisphenol-A ("BPA") that have been subsequently purchased by Plaintiffs. Specifically, Plaintiff brings this action on behalf of those who, over the past five years, purchased polycarbonate plastic bottle products containing BPA that were produced, manufactured, distributed, and/or sold by the Defendants and who were accordingly damaged thereby.

2.      BPA, a chemical which Defendants use to make their polycarbonate plastic bottle products, is a dangerous chemical that has been linked to serious human health problems. Indeed, researchers and scientists have been very concerned with the harmful effects of BPA for an extended period of time.  For well over a decade, hundreds of studies and papers, including very recent reports, have repeatedly shown that BPA can be toxic to humans even at extremely low doses.  Recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

3.      Yet, as alleged more fully below, despite this well-documented scientific evidence, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using this dangerous chemical which has been known for years to be toxic in several respects and which poses serious hazards to individuals' health.  Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual human health with little or no mention as to potentially toxic substance the products contain.

4.      Quite simply, Defendants have breached (and continue to breach) their duty to adequately disclose relevant and appropriate information regarding BPA in the marketing and sale of their polycarbonate plastic bottle products.  Accordingly, Plaintiff seeks redress in the form of disgorgement, restitution and any other appropriate relief including injunctive relief.

## II.    PARTIES

5.    Plaintiff is a resident of Seattle, Washington.  Plaintiff purchased polycarbonate plastic bottle products containing BPA and bearing the mark of Defendant Avent.

6.    Defendant Avent America, Inc. is an Illinois Corporation with its principal offices located in Bensenville, Illinois.  Defendant Avent produces, manufactures, distributes, and/or sells an array of polycarbonate plastic bottle products, which are primarily baby bottles and baby bottle accessories.

## III.    JURISDICTION AND VENUE

7.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(d).  The Plaintiff Class involves more than 100 individuals.  A member of the Plaintiff Class is a citizen of a state different from the Defendants, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000.00 exclusive of interest and costs.

8.    Venue is proper in this district under 28 U.S.C. §1391.  Defendant Avent is incorporated under the laws of the State of Illinois; has availed itself to the laws and protection of the State of Illinois; markets and sales plastic bottle products here; and has its principal offices in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Bisphenol A, Its Uses, And Actual/Potential Health Risks.

9.    As discussed above, this action concerns potentially toxic material used in polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by Defendants.  The potentially toxic material, otherwise known as the industrial chemical

Bisphenol-A (2, 2-bis (4-hydroxyphenly)-propane, hereinafter referred to as "BPA"), is currently used as a primary monomer[1] in polycarbonate plastic and epoxy resins.[2]

10.    BPA is a fundamental building block in polycarbonate plastics that are widely used in a myriad of consumer products – from mostly clear plastic baby bottles, training or spill-proof cups, and reusable drink containers (like those produced, manufactured, distributed, and/or sold by Defendants and purchased by Plaintiffs) to children's toys, microwavable food containers, beverage cans with epoxy linings, and hundreds of other products that consumers come into contact with every day.

11.    Although the strong polycarbonate plastic that BPA is used for appears indestructible and safe, unfortunately the material is dangerously flawed in a manner undetectable to the human eye.  The ester bond that links BPA monomers to one another to form polymer chains is not stable, and thus the polymer decays with time.  When liquid or food comes into contact with the decayed area, BPA is released into the liquid or food and ingested by the consumer.  This leaching of BPA from the plastic into the liquid or food is accelerated when these bottles are subjected to heat such as when the bottle is microwaved.

12.    The extreme cause for concern is that, for well over a decade, scientists have commented on, and been very troubled with, the harmful effects of BPA on human health.  Hundreds of studies and papers have repeatedly shown that BPA can be toxic even at extremely

---

[1]    A monomer is a small molecule that may become chemically bonded to other monomers to form a polymer.  A polymer is a substance composed of molecules with large molecular mass consisting of repeating structural units, or monomers, connected by covalent chemical bonds.  The individual molecules that comprise a polymer are referred to as polymer molecules.  In popular usage, the term "polymer" is used as a synonym for plastic.

[2]    Epoxy resins are polyether resins formed originally by the polymerization of Bisphenol-A and epichlorohydrin, having high strength, and low shrinkage during curing and can be used as a coating, adhesive, casting, or foam.

low doses and recent studies on lab animals have confirmed significant health risks associated with exposure to very low levels of BPA, and in particular, its estrogenic effect.

13.     Most recently, in April 2008, the National Toxicology Program ("NTP") issued a draft brief prepared by the NTP Center for the Evaluation of Risks to Human Reproduction ("CERHR") titled *DRAFT NTP BRIEF ON BISPHENOL A* (hereafter "NTP Draft Brief," attached hereto as Exhibit A) that discusses the chemical, human exposure, and whether BPA can affect human development or reproduction.

14.     The salient points about what BPA is and its uses are summarized below:

a.      BPA is a high production volume chemical that is widely used in the manufacture of polycarbonate plastics and epoxy resins;

b.      Polycarbonate plastics have many applications including use in certain food and drink packaging, e.g., water and infant bottles, compact discs, impact-resistant safety equipment, and medical devices;

c.      Polycarbonate plastics are typically clear and hard and marked with the recycle symbol "7" or may contain the letters "PC" near the recycle symbol; and

d.      Epoxy resins are used as lacquers to coat metal products such as food cans, bottle tops, and water supply pipes.

15.     NTP also explains how humans come into contact with BPA:

a.      The primary source of exposure to BPA for most people is through the diet, in food and beverages;

b.      BPA can migrate into food from food and beverage containers with internal epoxy resin coatings and from consumer products made of polycarbonate plastic such as baby bottles, tableware, food containers, and water bottles;

c.      The highest estimated intakes of BPA in the general population occur in infants and children. Infants and children have higher intakes of many widely detected environmental chemicals because they eat, drink, and breathe more than adults on a pound for pound basis. In addition, infants and children spend more time on the floor than adults and may engage in certain behaviors, such as dirt ingestion or mouthing of plastic items that can increase the potential for exposure; and

d.      Biomonitoring studies show that human exposure to BPA is widespread. The 2003 – 2004 National Health and Nutrition Examination Survey (NHANES III) conducted by the Centers for Disease Control and Prevention (CDC) found detectable levels of BPA in 93% of 2517 urine samples from people 6 years and older. This study did not include children younger than 6 years of age. The CDC NHANES data are considered representative of exposures in the United States because of the large number of people included in the survey and the process used to select participants. In addition, the analytical techniques used by the CDC to measure BPA are considered very accurate by the scientific community.

16.     NTP observed that studies with laboratory rodents show that exposure to high dose levels of BPA during pregnancy and/or lactation can reduce survival, birth weight, and growth of offspring early in life, and delay the onset of puberty in males and females. "These 'high' dose effects of [BPA] are not considered scientifically controversial and provide *clear evidence* of adverse effects on development in laboratory animals." *NTP Draft Brief*, at 9.

17.     NTP also observed that a variety of effects related to neural and behavior alterations, precancerous lesions in the prostate and mammary glands, altered prostate gland and urinary tract development, and early onset of puberty in females have been reported in laboratory

rodents exposed during development to much lower doses of BPA that are more similar to human exposures.

18.    NTP concluded, in part, that current exposures to BPA are possibly high enough to cause concern:

> "The 'high' dose effects of [BPA] in laboratory animals that provide *clear evidence* for adverse effects on development, i.e., reduced survival, birth weight, and growth of offspring early in life, and delayed puberty in female rats and male rats and mice, are observed at levels of exposure that far exceed those encountered by humans. However, estimated exposures in pregnant women and fetuses, infants, and children are similar to levels of [BPA] associated with several 'low' dose laboratory animal findings of effects on the brain and behavior, prostate and mammary gland development, and early onset of puberty in females."

*NTP Draft Brief*, at 32.

19.    Some other important recent studies concerning BPA and its potential effects on human health are summarized below:

a.    Experiments with rats demonstrate that low level exposure to BPA during fetal growth causes breast cancer in adults. *See* Murray, T. J., et al., *Induction of mammary gland ductal hyperplasias and carcinoma in situ following fetal bisphenol A exposure*, Reproductive Toxicology 23: 383-390.

b.    *In utero* exposure to BPA causes long-term effects on mammary tissue development in rats, increasing risks to cancer, and also increases to a chemical known to cause breast cancer. *See* Durando, M., et al. *Prenatal Bispheno A Exposure Induces Preneoplastic Lesions in the Mammary Gland in Wistar Rats*, Environmental Health Perspectives 115, No. 1 (January 2007).

c.    Perinatal exposure to extremely low levels of BPA causes precancerous prostate lesions in rats. *See* Ho, S-M, et al., *Developmental Exposure to Estradiol and*

*Bisphenol A Increases Susceptibility to Prostate Carcinogenesis and Epigenetically Regulates Phosphodiesterase Type 4 Variant 4*, Cancer Research 66: 5624-5632.

      d.    Experiments with mice reveal that chronic adult exposure to BPA causes insulin resistance. *See* Alonso-Magdalena, P., et al., *The Estrogenic Effect of Bisphenol-A Disrupts the Pancreatic B-Cell Function in vivo and Induces Insulin Resistance*, Environmental Health Perspectives 114:106-112.

      e.    In a small prospective study, researchers in Japan report that BPA levels are higher in women with a history of repeated spontaneous miscarriages.  *See* Sugiura-Ogasawara, M., et al., *Exposure to bisphenol A is associated with recurrent miscarriage*, Human Reproduction 20: 2325-2329.

      f.    BPA and the birth control pharmaceutical ethinylestradiol cause adverse effects in prostate development in mice at levels to which millions of Americans are exposed each year.  *See* Timms, B. G., et al., *Estrogenic chemicals in plastic and oral contraceptives disrupt development of the fetal mouse prostate and urethra*, Proceedings of the National Academy of Sciences, 10.1073/pnas.0502544102.

      g.    A flood of new information about BPA revealing both widespread human exposure and effects at extremely low doses sparks a call for a new risk assessment of the compound.  *See* vom Saal, F., et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment*, Environmental Health Perspectives 115:8 (August 2005).

      h.    Several weakly estrogenic compounds including BPA are as powerful as estrogen at increasing calcium influx into cells and stimulating prolactin secretion. *See* Wozniak, A. L., et al., *Xenoestrogens at Picomolar to Nanomolar Concentrations*

*Trigger Membrane Estrogen Receptor-alpha-Mediated Ca++ Fluxes and Prolactin Release in GH3/B6 Pituitary Tumor Cells*, Environmental Health Perspectives 113:431-439.

i.      BPA at extremely low levels causes changes in brain structure and behavior in rats.  *See* Kubo, K., et al., *Low dose effects of bisphenol A on sexual differentiation of the brain and behavior in rats*, Neuroscience Research 45: 345-356.

j.      Exposures to 1/5th the level considered safe are sufficient to alter maternal behavior in mice.  *See* Palanza, P., et al, *Exposure to a low dose of bisphenol A during fetal life or in adulthood alters maternal behavior in mice*, Environmental Health Perspectives 110 (suppl 3): 415-422.

k.      An accident in the lab, followed by careful analysis and a series of experiments reveals that BPA causes aneuploidy in mice at low levels of exposure. Because aneuploidy in humans causes spontaneous miscarriages and some 10-20% of all birth defects, this implicates BPA in a broad range of human developmental errors.  *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse*, Current Biology 13: 546-553.

l.      Experiments by researchers at the University of Missouri raise the possibility of widespread contamination of laboratory experiments by BPA.  Their results demonstrate that at room temperature significant amounts of this estrogenic substance leach into water from old polycarbonate animal cages.  This inadvertent contamination could interfere with experiments designed to test the safety of estrogenic chemicals, and lead to false negatives and conflicting results. *See* Howdeshell, K. A., et al., *Bisphenol A*

*is released from used polycarbonate animal cages into water at room temperature*, Environmental Health Perspectives doi:10.1289/ehp.5993.

   m. An analysis of the biochemical mechanisms of endocrine disruption suggests why industry has been unable to replicate crucial low-dose impacts of BPA on prostate development. *See* Welshons, W. V., et al., *Large effects from small exposures. I. Mechanisms for endocrine disrupting chemicals with estrogenic activity*, Environmental Health Perspects doi:10.1289/ehp.5494.

   n. Using new analytical methods, a team of German scientists measured BPA in the blood of pregnant women, in umbilical blood at birth and in placental tissue. All samples examined contained BPA, at levels within the range shown to alter development. Thus widespread exposure to BPA at levels of concern is no longer a hypothetical issue. *See* Schonfelder, G., et al., *Parent Bisphenol A Accumulation in the Human Maternal-Fetal-Placental Unit*, Environmental Health Perspectives 110:A703-A707.

   o. At extremely low levels, BPA promotes fat cell (adipocyte) differentiation and accumulation of lipids in a cell culture line used as a model for adipocyte formation. These two steps, differentiation and accumulation, are crucial in the development of human obesity. Hence this result opens up a whole new chapter in efforts to understand the origins of the world-wide obesity epidemic. *See* Masuno, H., et al., *Bisphenol A in combination with insulin can accelerate the conversion of 3T#-L1 fibroblasts to adipocytes*, Journal of Lipid Research 3:676-684.

   p. In cell culture experiments, BPA at very low (nanomolar levels) stimulates androgen-independent proliferation of prostate cancer cells. This finding is especially important because when prostate tumors become androgen-independent they no longer

respond to one of the key therapies for prostate cancer. *See* Wetherill, Y. B., et al., *The Xenoestrogen Bisphenol A Induces Inappropriate Androgen Receptor Activation and Mitogenesis in Prostatic Adenocarcinoma Cells*, Molecular Cancer Therapeutics 1: 515-524.

q.    BPA causes changes in rat ventral prostate cells that appear similar to events that make nascent prostate tumors in humans more potent. *See* Ramos, JG, et al., *Prenatal Exposure to Low Doses of Bisphol A Alters the Periductal Stroma and Glandular Cell Function in the Rat Ventral Prostate*, Biology of Reproduction 65: 1271-1277.

r.    BPA induces changes in mouse mammary tissue that resemble early stages mouse and human of breast cancer. *See* Markey, C. M., et al., *In Utero Exposure to Bisphenol A Alters the Development and Tissue Organization of the Mouse Mammary Gland*, Biology of Reproduction 65: 1215-1223.

s.    BPA lowers sperm count in adult rates even at extremely low levels. *See* Sakaue, M., et al., *Bisphenol-A Affects Spermatogenesis in the Adult Rat Even at a Low Dose*, Journal of Occupational Health 43: 185-190.

t.    BPA at extremely low levels creates superfemale snails. *See* Oehlmann, J., et al., *Effects of endocrine disruptors on Prosobranch snails (Mollusca:Gastropoda) in the laboratory. Part I: Bisphenol A and Octylphenol as xenoestrogens*, Exotoxicology 9: 383-397.

u.    BPA is rapidly transferred to the fetus after maternal intake. *See* Takahashi, O., et al., *Disposition of Orally Administered 2,2-Bis (4-hydroxyphenyl)*

*propane (Bisphenol A) in Pregnant Rats and the Placental Transfer to Fetuses*, Environmental Health Perspectives 108: 931-935.

v.     An independently funded academic laboratory can verify controversial BPA results, even though industry cannot.   *See* Gupta, Chhanda, *Reproductive malformation of the male offspring following maternal exposure to estrogenic chemicals*, Proceedings of the Society for Experimental Biology and Medicine 224: 61-68.

w.     Metabolic differences between rats and humans probably mean that humans are more sensitive to BPA than are rats. *See* Elsby, R., et al., *Comparison of the modulatory effects of human and rat liver microsomal metabolism on the estrogenicity of bisphenol A: implications for extrapolation to humans*, Journal of Pharmacology and Experimental Therapeutics 297-103-113.

x.     A confirmation of BPA low dose effects, and demonstration that the effects include impacts on estrous cyclicity and plasma LH levels. *See* Rubin, B. S., et al., *Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels*, Environmental Health Perspectives 109: 675-680.

y.     BPA speeds the pace of sexual development in mice, and causes mice to be obese. *See* Hodeshell, K., et al., *Plastic bisphenol A speeds growth and puberty*, Nature 401: 762-764.

20.     Recently, and worthy of further highlight, on or about November 28-30, 2006, a National Institute of Health Funded Group (the "Group") consisting of 38 of the world's leading scientists with regard to Bisphenol-A, met at Chapel Hill, North Carolina to examine the relationship between BPA and the negative trends in human health that have occurred in recent

decades such as increases in abnormal penile/uretha development in males, early sexual maturation caused in females, increased neuron-behavioral problems such as ADHD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm court, and an increase in hormonally mediated cancers, such as prostate and breast cancers. Heightened concern was paid to the relationship between treatment with "low doses" of BPA and the many negative health outcomes confirmed by experimental studies in laboratory animals as well as in vitro studies that identified plausible molecular mechanisms responsible for mediating such effects.

21.     This eminent collection of scientists concluded that the wide range of adverse effects of low doses of BPA in laboratory animals exposed both during development and in adulthood "is a great cause for concern with regard to the potential for similar adverse effects in humans." The Group also concluded that recent trends in human diseases relate to adverse observed in experimental animals exposed to low doses of BPA, the specific examples of which include the conditions described in Paragraph 20.

22.     Furthermore, the Group concluded that there is extensive evidence documenting that negative health outcomes may not become apparent until long after BPA exposure during development has occurred – that the issue of a very long latency for effects *in utero* is well known and these developmental effects are irreversible and can occur due to low dose exposure during brief sensitive periods in development, even though BPA may not be detected when the damage or disease is expressed. Furthermore, the group's findings indicate that acute studies in animals, particularly traditional toxicological studies that only involve the use of high doses of BPA (like those relied upon by the chemical and plastic industries), do not reflect the situation in humans.

23.    Consistent with these well-accepted and well-founded conclusions as reached by the Group, the NTP found that the "possibility that bisphenol-a may alter human development cannot be dismissed." *NTP Draft Brief*, at 9.

24.    Given statements such as these, of immediate and urgent concern is BPA's toxicity and its link to serious and significant health problems, which pose a serious threat to Plaintiff's and the proposed Plaintiff Class' health; and, as in Plaintiff's case, the health of their infants and children.

## B.    Defendants' Wrongful Conduct.

25.    During all times relevant hereto, and despite the well-documented scientific evidence discussed above, the Defendants have failed (and continue to fail) to adequately disclose that their polycarbonate plastic bottle products are formulated using a dangerous chemical that has been known for years to be toxic in several respects and which poses serious hazards to an individuals' health.  Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual health with no mention as to the potentially toxic substance the products contain.

26.    For example, Defendant Avent's business strategy seems to target consumers which are new and/or expecting parents by touting its products as superior, in terms of both healthiness and safety, when compared to other similar baby products.  On its website, Defendant Avent boasts that it "has distinguished itself as a brand that marks the highest standard in infant feeding."

http://aventamerica.gsdesign.com/about/index.asp (May 6, 2008).

27.    In promoting the supposed health benefits associated with the use of Defendant Avent's polycarbonate bottle products, Defendant Avent's website boasts that "[o]ur award-

winning products are efficient, easy to use, and backed by clinical studies, and the reason Avent is recommended by more doctors than any other brand. We are committed to making it easier for parents to have flexible feeding choices while providing the best for their babies."

http://aventamerica.gsdesign.com/about/index.asp (May 6, 2008).

28.    Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have made (and continue to make) similar claims.  Yet, while Defendant Avent's labeling and packaging of its polycarbonate plastic bottle products have touted (and continues to tout) the products' supposed health benefits, safeness, and overall superiority, the labeling and packaging has not (and does not) sufficiently and/or adequately disclosed material information as to the fact that its polycarbonate plastic bottle products are formulated with and/or contain BPA, nor material information as to the potential health risks associated with polycarbonate plastic bottle products and BPA as discussed above.

29.    Defendant Avent has failed (and continues to fail) to properly and adequately disclose the risk of harm to Plaintiff and the proposed Plaintiff Class despite the fact that it knew, or should have known, of the potential harm posed by its polycarbonate plastic bottle products, which contain BPA.  The failure to disclose as described herein is a misrepresentation and constitutes a deceptive and/or unfair trade practice consistent with applicable statutory and common law.

30.    The polycarbonate plastic bottle products purchased by Plaintiff from Defendant Avent are polycarbonate plastic bottle products that contain the dangerous chemical Bisphenol-A.   Specifically, Plaintiff purchased 4 oz. and 8 oz. reusable baby bottles produced, manufactured, distributed, and/or sold by Aventis.

31.    Plaintiff purchased Defendant Avent's polycarbonate plastic bottle products unaware that they were formulated with and/or contained BPA, a potentially toxic material, because Defendant Avent did not adequately disclose such information. Had she known, she would not have purchased Defendant Avent's polycarbonate plastic bottle products.

32.    Indeed, although consumers can try to avoid polycarbonate plastic bottle products, most (like Plaintiff) were/are simply unaware that a toxic chemical which acts like a female hormone can leach from these products and contaminate the liquid or food ingested by them, and/or more importantly, their children.

33.    This lack of consumer awareness is a direct result of the Defendant Avent's, and the other Defendants', efforts to perpetuate a very lucrative revenue stream that would be interrupted and reduced if the general public and persons similarly situated to Plaintiff were to learn the truth and seek safer alternatives.

## V.      CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23 are met with respect to the classes defined below.

### A.      The Plaintiff Class.

35.    Plaintiff brings her claim on her own behalf, and on behalf of the following class:

> All persons in the United States who, over the past five years, purchased polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendants and who were accordingly damaged thereby.

36.    Plaintiff reserves the right to amend or modify her Complaint and/or the Plaintiff Class definition in connection with meaningful discovery and/or a Motion for Class Certification.

37.     Members of the Plaintiff Class are so numerous and geographically dispersed that joinder of all Class members is impracticable.  The Plaintiff Class, upon information and belief, includes thousands if not hundreds of thousands of individuals geographically dispersed throughout the United States.  The precise number and identities of Class members are unknown to Plaintiff but can be easily obtained through notice and discovery.  Indeed, notice can be provided through a variety of means including publication, the cost of which is properly imposed upon the Defendant.

38.     Plaintiff will fairly and adequately protect the interests of all Plaintiff Class members and has retained counsel competent and experienced in class and consumer litigation.

39.     Plaintiff's claims are typical of the claims of the Plaintiff Class and all Plaintiff Class members sustained uniform damages arising out of the conduct challenged in this action. The Plaintiff Class is ascertainable and there is a well-defined community of interests in the questions of law and/or fact alleged since the rights of each Plaintiff Class member were infringed or violated in a similar fashion based upon the Defendants' wrongdoing.  The injuries sustained by the Plaintiff and the Plaintiff Class members flow, in each instance, from a common nucleus of operative facts – the Defendant's wrongdoing.  In every related case, Plaintiff and the Plaintiff Class members suffered uniform damages caused by their purchase of polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by the Defendants.

40.     There are questions of law and fact common to the Plaintiff Class that predominate over any questions solely affecting individual Plaintiff Class members.  Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Plaintiff Class members.  Individual questions, if any, pale by comparison to the numerous common questions that predominate.

41.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Plaintiff Class members is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Plaintiff Class members to individually redress the wrongs done to them.

42.     Defendants have acted or have refused to act on grounds generally applicable to the Plaintiff Class thereby making it appropriate to grant final declaratory and injunctive relief with respect to the Plaintiff Class as a whole.

**B.     The Defendant Class.**

43.     Defendant Avent is sued herein individually and as the representative of the Defendant Class described above consisting of all producers, manufacturers, and/or otherwise distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A.

44.     The Defendant Class is composed of numerous companies substantially similar to Defendant Avent; so much so that joinder of all of the Defendants as named defendants would impracticable.

45.     The claims and defenses of Defendant Avent are typical of the claims and defenses of the other Defendants, and Defendant Avent will fairly and adequately protect the interests of all other members of the Defendant Class.

46.     There are questions of law and fact common to the members of the Defendant Class that predominate over any individual questions affecting individual Defendants.

47.     Prosecution of separate actions by individual members of the Defendant Class would create a risk of inconsistent or varying adjudications with respect to individual members

of the proposed class, which would establish incompatible standards of conduct for the Defendants.

48.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Individual members of the Defendant Class do not have a great interest in individually controlling the defense of separate actions.  Further, many of the members of the proposed Defendant Class do not have individual defenses to this action, and any core ruling or precedent affecting the named Defendants would be equally applicable to all members of the Defendant Class.

49.    Concentrating this litigation is one forum is desirable, because it would greatly conserve judicial resources and provide for the expedient and efficient resolution of the claims asserted herein.

50.    This proposed class action does not present any extraordinary or unusual difficulties affecting its management as a class action.  Plaintiff knows of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Indeed, it would be the most appropriate structure of litigation.

## VI.    CAUSES OF ACTION

### COUNT I: *VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT*

51.    Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

52.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), 815 Illinois Compiled Statute ("Ill. Comp. Stat.") § 505/1 *et seq.*, is a remedial statute designed to protect consumers from deceptive, unfair, and unconscionable trade practices.

53.     As set forth herein, Defendants have violated provisions of the Act because they have utilized unfair and/or deceptive acts and practices, including but not limited to the use or employment of deception, fraud, false pretense, false promise, misrepresentation and/or the concealment, suppression and/or omission of material facts, with the intent that others rely upon the concealment, suppression and/or omission of such material facts, in their commercial and business practices relating to their polycarbonate plastic bottle products.

54.     As set forth herein, Defendants have also violated provisions of the Act because they have used and/or employed practices described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965 [815 Ill. Comp. Stat. § 510/2] in their commercial and business practices.  Specifically, Defendants have (1) represented that their polycarbonate plastic bottle products are of a particular standard, quality, or grade though they are of another; (2) advertised their polycarbonate plastic bottle products with the intent not to sell them as advertised; and/or (3) engaged in conduct which similarly creates the likelihood for confusion and/or misunderstanding.

55.     Defendants have engaged in unconscionable, false, and/or deceptive acts in their commercial and business practices.  Through their marketing and sales practices associated with their polycarbonate plastic bottle products, Defendants unfairly and deceptively misled their eventual customers by misrepresenting their products as safe and/or failing to disclose the risks, or potential risks of harm posed by their products.

56.     In light of Defendants' misrepresentations and Defendants' failure to disclose, or clearly and conspicuously disclose, all material information related to their polycarbonate plastic bottle products, Defendants have used deception, fraud and/or false pretenses to sell their polycarbonate plastic bottle products, and Defendants concealed, suppressed and omitted

20

material facts surrounding their polycarbonate plastic bottle products with the intent that others rely upon the concealment, suppression, and omission.

57.    Defendants' acts or practices in marketing and/or selling its polycarbonate plastic bottle products through the use of deceptive and unfair business practices offends established public policy and is unethical, oppressive, unscrupulous or substantially injurious to consumers. The deceptive trade practices described above significantly impact the public as actual or potential consumers of Defendants' goods.

58.    Defendants' unfair and deceptive trade practices, amounting to violations of the Act, proximately caused damage to Plaintiff and the Plaintiff Class members.

59.    Accordingly, consistent with the remedial provisions of the Act, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

## COUNT II: *STRICT PRODUCTS LIABILITY – DEFECT IN DESIGN OR MANUFACTURE*

60.    Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

61.    Defendants, as commercial suppliers of polycarbonate plastic bottle products, have an absolute duty to refrain from placing into the stream of commerce an unreasonably dangerous product that is not fit for consumption or use which can cause injury to person or property.

62.    Defendants breached that duty (and continue to breach that duty) by placing into the stream of commerce unreasonably dangerous products that are not fit for consumption or use which has caused injury to both persons and property.  These products were unreasonably dangerous because they contained manufacturing and/or design defects.

63.     The unreasonably dangerous products Defendants placed into the stream of commerce reached consumers such as Plaintiff and the Plaintiff Class members without substantial change in the condition in which they were was supplied.

64.     Plaintiff and the Plaintiff Class members were reasonably foreseeable users of Defendants' unreasonably dangerous products and used these unreasonably dangerous products in a foreseeable manner. As a result, they have suffered significant damages caused directly and proximately by their use of Defendants' unreasonably dangerous products.

65.     Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

**COUNT III:** *STRICT PRODUCTS LIABILITY – FAILURE TO WARN*

66.     Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

67.     Defendants have placed into the stream of commerce unreasonably dangerous products that are not fit for consumption or use and which can cause injury to person or property.

68.     Simultaneously, Defendants have also failed to warn the reasonably foreseeable users of their products, including Plaintiff and the Plaintiff Class members, of the known dangers associated with their unreasonably dangerous products despite the fact that Defendants knew, or should have known, of the known dangers associated with their unreasonably dangerous products. Even after Defendants became, or should have become, aware of the dangerous condition of their products; they still refused to investigate potential problems in a reasonable manner and failed to warn consumers of these potential problems thereby allowing countless other consumers to purchase the unreasonably dangerous products.

69.     As a direct and proximate result of Defendants' actions, Plaintiff and the Plaintiff Class members have suffered significant damages.

70.     Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

## COUNT IV: *BREACH OF IMPLIED WARRANTY – FITNESS FOR PURPOSE*

71.     Plaintiff incorporates by reference all of the foregoing paragraphs as if set forth herein.

72.     Plaintiff, and the members of the Plaintiff Class, sought to purchase safe, reusable beverage containers.  In doing so, Plaintiff and the members of the Plaintiff Class relied on Defendants' skill and judgment to select and furnish suitable goods for that purpose; on or about the time Defendants sold to Plaintiff and the Plaintiff Class members their polycarbonate plastic bottle products.

73.     By the acts set forth in detail above, Defendants warranted that the polycarbonate plastic bottle products were safe, but intentionally omitted, suppressed, and withheld material information regarding risks associated with BPA found in their products.  Plaintiff and the members of the Plaintiff Class bought Defendants' polycarbonate plastic bottle products relying on Defendants' skill, judgment and representations.  However, Defendants' polycarbonate plastic bottle products are not free from risk from harmful exposure to BPA, as set forth in detail above.

74.     At the time of the sale(s), Defendants had reason to know the particular purpose for which their goods were being offered and acquired, and that Plaintiff and the members of the Plaintiff Class were relying on Defendants' skill and judgment to select and furnish suitable and

safe goods for that purpose. Accordingly, there was an implied warranty that the goods were fit for this purpose.

75. However, Defendants breached this warranty implied at the time of sale by providing goods that are/were unsuitable for the purpose for which they were made and purchased because the polycarbonate plastic bottle products sold were not free from risk of harmful exposure to BPA as discussed above.

76. As a direct and proximate result of Defendants' actions, Plaintiff and the Plaintiff Class members have suffered significant damages.

77. Accordingly, Plaintiff and the Plaintiff Class are entitled to judgment against the Defendants for their actual damages in the form of restitution, attorneys' fees and costs of litigation.

## VII.    JURY TRIAL DEMANDED

78. Plaintiff and the proposed Plaintiff Class demand a jury of twelve.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated; request that she and the other applicable Plaintiff Class members have judgment entered in their favor and against Defendants, as follows:

A.    An order certifying that this action, involving Plaintiff's and the Plaintiff Class members' claims against Defendant Avent and the Defendant Class be maintained as a nationwide class action under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and their undersigned counsel to represent the Plaintiff Class;

B.    An award of actual damages in the form of restitution;

C.    Appropriate injunctive relief;

D.    Reasonable attorneys' fees and costs; and

E.    Such further appropriate relief this Court deems necessary.


DATED:    May 6, 2008         **LASKY & RIFKIND**


              __/s/ Norman Rifkind_____

              Norman Rifkind
              Leigh R. Lasky
              Amelia S. Newton
              350 North LaSalle Street, Suite 1320
              Chicago, IL 60610
              Telephone:  (312) 634-0057
              *(Local Counsel for Plaintiff)*

              EMERSON POYNTER LLP
              Scott E. Poynter
              Email: scott@emersonpoynter.com
              Christopher D. Jennings
              Email: cjennings@emersonpoynter.com
              Gina M. Cothern
              Email: gcothern@emersonpoynter.com
              The Museum Center
              500 President Clinton Ave., Ste. 305
              Little Rock, AR 72201
              Telephone: (501) 907-2555
              Facsimile: (501) 907-2556

              John G. Emerson
              Email: jemerson@emersonpoynter.com
              830 Apollo Lane
              Houston, TX  77058
              Phone:  (281) 488-8854
              Fax: (281) 488-8867

              WHATLEY DRAKE & KALLAS, LLC
              Joe R. Whatley, Jr.

Email: jwhatley@wdklaw.com
Edith M. Kallas
Email: ekallas@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Facsimile: (212) 447-7077

**_Counsel for Plaintiff_**



————FILED
————LODGED
————RECEIVED

MAY 2 7 2008

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                           DEPUTY



**08-CV-00693-FINAFF**



## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

In Re Bisphenol-A Tainted Polycarbonate Plastic Litigation          MDL Docket No. ____

_____/

## AMENDED MOTION OF PLAINTIFFS ELIZABETH
## BANSE, SHARON HATTER AND DALE L. RAGGIO, JR.'S
## FOR TRANSFER AND CONSOLIDATION OF RELATED
## ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS

Plaintiffs, Elizabeth Banse, Sharon Hatter and Dale L. Raggio, Jr., ("Movants"),[1] by their

undersigned counsel, respectfully move this Panel, pursuant to 28 U.S.C. §1407, for transfer and

consolidation for pretrial purposes fourteen substantially similar nationwide class action cases

relating to defendants' production, manufacture and/or distribution of polycarbonate plastic

bottle products, including baby bottles and baby accessories, containing the industrial chemical

Bisphenol-A ("BPA") that have been purchased by Movants and other members of the Class

and, in support thereof, Movants respectfully submit this Motion and the attached

---

[1] This motion is filed on behalf of plaintiffs in _Banse v. Avent America, Inc._, 08-CV-2604 TG (N.D. Ill.), _Hatter v. New Wave Enviro. Prods._, 08-CV-3154 JCE (W.D. Mo.), _Campbell v. Playtex Prods. Inc._, 08-CV-00763 WWE (D. Conn.) and _Raggio v. Gerber Prods. Co._, 08-CV-0403 JLH (W.D. Ark).

Memorandum, pursuant to 28 U.S.C. §1407 ("Section 1407") and Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, and state the following:

1.    Plaintiffs seek transfer and consolidation of fourteen class action lawsuits, pending in eight separate federal districts, to the Northern District of Illinois.

2.    The cases at issue satisfy the prerequisites for transfer and consolidation since: (a) they "involv[e] one or more common questions of fact"; (b) the transfer and consolidation of the cases would further "the convenience of the parties and the witnesses,"; and (c) the transfer and consolidation will "promote the just and efficient conduct of [the] actions" by ensuring oversight of pretrial proceedings. 28 U.S.C. § 1407.

3.    The Panel has recognized the Northern District of Illinois, a frequent transferee forum, as a geographically convenient transferee forum with the ability, the resources and the judicial expertise necessary to manage complex multidistrict litigation.

4.    The Hon. David H. Coar, U.S. District Judge for the Northern District of Illinois, currently presides over *Banse v. Avent America, Inc.,* 08-CV-2604 (N.D. Ill.), filed by one of the above-referenced parties. As the Panel has previously recognized, Judge Coar has considerable relevant experience as he currently presides over three other multidistrict actions.

Movants therefore respectfully request that the Judicial Panel on Multidistrict Litigation

(the "Panel") enter an Order transferring all related actions to the court of Hon. David H. Coar in

the Northern District of Illinois for consolidated pretrial proceedings pursuant to Section 1407.


DATED:          May 20, 2008                    Respectfully Submitted,


                                                _____/s/ Edith M. Kallas_____
                                                Edith M. Kallas
                                                Joe R. Whatley
                                                Dominique Day
                                                **WHATLEY DRAKE & KALLAS, LLC**
                                                1540 Broadway, 37th Floor
                                                New York, New York  10036
                                                Phone: (212) 447-7070
                                                Fax:  (212) 447-7077
                                                *ekallas@wdklaw.com*
                                                *jwhatley@wdklaw.com*
                                                *dday@wdklaw.com*

                                                John G. Emerson
                                                Scott E. Poynter
                                                **EMERSON POYNTER LLP**
                                                The Museum Center
                                                500 President Clinton Ave, Suite 305
                                                Little Rock, AR 72201
                                                Phone:  (501) 907-2555
                                                Fax:  (501) 907-2556
                                                *jemerson@emersonpoynter.com*
                                                *scott@emersonpoynter*

                                                Jack T. Patterson, II
                                                Arkansas State Bar No. 95012
                                                Jeremy Y. Hutchinson
                                                Arkansas State Bar No.  2006-145
                                                **PATTON ROBERTS, PLLC**
                                                The Stephens Building
                                                111 Center Street, Suite 1315
                                                Little Rock, AR  72201
                                                Phone: (501) 372-3480
                                                Fax: (501) 372-3488
                                                *jpatterson@pattonroberts.com*


                                                3

*jhutchinson@pattonroberts.com*

Jim Wyly
Arkansas Bar No. 90158
**PATTON ROBERTS, PLLC**
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas 75505-6128
Phone: (903) 334-7000
Fax: (903) 334-7007
*jwyly@pattonroberts.com*

***Counsel for Plaintiffs Elizabeth Banse, Sharon Hatter and Dale Raggio***



—FILED
—LODGED
—RECEIVED   MAIL

MAY 27 2008

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                           DEPUTY

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

In Re Bisphenol-A Tainted Polycarbonate Plastic Litigation          MDL Docket No. _____

---

## AMENDED MEMORANDUM IN SUPPORT OF PLAINTIFFS
## ELIZABETH BANSE, SHARON HATTER, AND DALE L. RAGGIO,
## JR.'S MOTION FOR TRANSFER AND CONSOLIDATION OF
## RELATED ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS

Movants, Elizabeth Banse, Sharon Hatter and Dale L. Raggio, Jr., ("Movants"),[1] by their

undersigned counsel, seek transfer of fourteen class action lawsuits, pending in eight separate

federal districts, to the Northern District of Illinois.  In support thereof, Movants respectfully

submit this memorandum, pursuant to 28 U.S.C. §1407 ("Section 1407") and Rule 7.2 of the

Rules of Procedure of the Judicial Panel on Multidistrict Litigation, to transfer and consolidate

for pretrial purposes fourteen substantially similar cases relating to defendants' production,

manufacture and/or distribution of polycarbonate plastic bottle products, including baby bottles

and baby accessories, containing the industrial chemical Bisphenol-A ("BPA") that have been

---

[1] This motion is filed on behalf of plaintiffs in *Banse v. Avent America, Inc.*, 08-CV-2604 TG (N.D. Ill.), *Hatter v. New Wave Enviro. Prods.*, 08-CV-3154 JCE (W.D. Mo.), *Campbell v. Playtex Prods. Inc.*, 08-CV-00763 WWE (D. Conn.) and *Raggio v. Gerber Prods. Co.*, 08-CV-0403 JLH (W.D. Ark).

purchased by Movants and other members of the Class.  Movants herein seek to have these actions consolidated for pretrial purposes and transferred to the Northern District of Illinois.

As set forth below, the cases at issue satisfy the prerequisites for transfer and consolidation since: (a) they "involv[e] one or more common questions of fact"; (b) the transfer and consolidation of the cases would further "the convenience of the parties and the witnesses,"; and (c) the transfer and consolidation will "promote the just and efficient conduct of [the] actions" by ensuring oversight of pretrial proceedings.  28 U.S.C. § 1407.

Movants therefore respectfully request that the Judicial Panel on Multidistrict Litigation (the "Panel") enter an Order transferring all related actions to the court of Hon. David H. Coar in the Northern District of Illinois for consolidated pretrial proceedings pursuant to Section 1407. Judge Coar, who presides over *Banse v. Avent America, Inc.,* 08-CV-2604 (N.D. Ill.), has considerable relevant experience as he currently presides over three other multidistrict actions. Furthermore, this Panel has recognized the Northern District of Illinois, a frequent transferee forum, as a geographically convenient transferee forum with the ability, the resources and the judicial expertise necessary to manage complex multidistrict litigation.  Accordingly, the Northern District of Illinois is the most appropriate transferee forum.

## I.    INTRODUCTION

All of the actions for which Plaintiffs seek transfer involve the industrial chemical Bisphenol-A (2, 2-bis (4-hydroxyphenly)-propane, hereinafter referred to as "BPA"), a potentially toxic material used in polycarbonate plastic bottle products produced, manufactured, distributed, and/or sold by Defendants.  BPA, a fundamental building block of polycarbonate plastics, is found in a wide variety of consumer products, including plastic baby bottles, spill-proof or "sippy" cups, reusable drink containers, children's toys, microwavable food containers, beverage cans with epoxy linings, and hundreds of other products that consumers come into

contact with every day. However, BPA is a flawed compound that commonly decays in polycarbonate plastic containers over time. When this occurs, BPA is released into the liquid or food in the polycarbonate containers and ingested by the consumer, with harmful effects to human health. This leaching of BPA into liquid or food is accelerated when these bottles are subjected to heat, such as when the bottle is microwaved. Human exposure to BPA is widespread, but infants and children represent the highest estimated intakes of BPA. Hundreds of studies have shown significant health risks associated with exposure to even very low levels of BPA.

At least fourteen (14) class actions are currently pending against defendants[2] regarding defendants' production, manufacture and/or distribution of polycarbonate plastic bottle products containing BPA. As all of these cases were filed in the last month, and since Plaintiffs' counsel has consented to extend Defendant Avent's deadline to answer, these actions are in the same posture procedurally – at the very nascent stages of litigation. No court has yet had the opportunity to analyze or consider the issues presented here.

In the actions, Plaintiffs allege they would not have purchased polycarbonate plastic baby bottles and other polycarbonate products containing BPA had they known the adverse health propensities associated with proximity to BPA and bring *inter alia*, in varying forms, claims of strict liability, breach of implied warranty, unjust enrichment, and negligent design, testing, inspection, distribution, labeling, marketing, sale and/or manufacture of these products.

These actions include:

- *Banse v. Avent America, Inc.,* 08-CV-2604 (N.D. Ill.), filed May 6, 2008.
- *Raggio v. Gerber Prods. Co.,* 08-CV-403 (W.D. Ark.), filed May 7, 2008.

---

[2] Claims are currently pending against Avent America, Inc., Gerber Products Company, Playtex Products, Inc., EvenFlo Company, Inc., RC2, Philips Electronics North America Corporation, Nalge Nunc International Company, New Wave Enviro Products, Handi-Craft Company, and the Defendant Class of producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-A.

3

- *Lanza v. Avent America, Inc.,* 08-CV-2960 (C.D. Cal.), filed May 6, 2008.
- *Matusek v. Gerber Prods. Co.,* 08-CV-2692 (C.D. Cal.), filed May 6, 2008.
- *O'Neill v. Evenflo Co., Inc.,* 08-CV-2963 (C.D. Cal.), filed May 6, 2008.
- *Rasmussen v. Handi-Craft Co.,* 08-CV-2961 (C.D. Cal.), filed May 6, 2008.
- *Hatter v. New Wave Enviro. Prods.,* 08-CV-3154 (W.D. Mo.), filed April 30, 2008.
- *Sullivan, et al., v. Avent America, Inc., et al.,* 08-CV-309 (W.D. Mo.), filed April 30, 2008.
- *Wilson, et al., v. Avent America, Inc., et al.,* 08-CV-02201 (D. Kan), filed May 1, 2008.
- *Jaynes, et al., v. Avent America, Inc., et al.,* 08-CV-693 (W.D. Wash.), filed May 2, 2008.
- *Gale, et al., v. RC2, et al.,* 08-CV-702 (W.D. Wash.), filed May 5, 2008.
- *Thompson-Foster v. Gerber, et al.,* 08-CV-1073 (E.D. Cal.), filed May 13, 2008
- *Felix-Lozano v. Nalge Nunc Int'l Co.,* 08-CV-854 (E.D. Cal.), filed April 22, 2008
- *Campbell v. Playtex Prods. Inc.,* 08-CV-00763 (D. Conn.), filed May 19, 2008

These cases seek appropriate injunctive relief and to recover damages on behalf of all damaged

purchasers of polycarbonate plastic bottle products containing the industrial chemical Bisphenol-

A that produced, manufactured, distributed, and/or sold by Defendants.[3]

The Panel should consolidate and transfer the actions to the Northern District of Illinois

for the following reasons:

- Many key witnesses, documents, and other evidence exist within the Northern District of Illinois, the principal place of business of Defendant Avent America, Inc. and a prime location where the other defendants conduct business in all of the actions.

- The Northern District of Illinois has the necessary experience and resources to handle this litigation – the Panel has previously recognized this fact and has frequently transferred multidistrict litigation to the Northern District of Illinois, and to the Hon. David H. Coar, who is currently presiding over this action, for precisely this reason.

- The Northern District of Illinois is geographically convenient and accessible for all parties and their counsel.

- Common questions of fact and law suggest that principles of economy and efficiency, for both the judicial system and the parties, would be served by consolidation and transfer. Transfer pursuant to Section 1407 will further insure the nationwide class in this case receives consistent treatment and rulings as these actions proceed.

---

[3] *Coyne v. Playtex Prods., Inc.,* 08-CV-2904 (C.D. Cal.), filed May 2, 2008, was voluntarily dismissed without prejudice on May 13, 2008.

For these reasons, Movants believe that the Northern District of Illinois is the most appropriate transferee forum for the consolidation of the actions against defendants.

## II.    STATEMENT OF FACTS

BPA, a chemical which defendants use to make their polycarbonate plastic bottle products, is a dangerous chemical that can be linked to serous human health problems.  For well over a decade, hundreds of studies and papers, including very recent reports, have repeatedly shown that BPA can be toxic to humans even at extremely low doses.

Yet, despite this well-documented scientific evidence, defendants have failed (and continue to fail) to disclose that their polycarbonate plastic bottle products are formulated using this dangerous chemical.  Indeed, the products are often marketed by highlighting their supposed benefits to the overall environmental and, most disturbingly, individual human health with no mention as to the potentially toxic substances contained in the products.

Defendants have breached their duty to disclose relevant and appropriate information regarding BPA in the marketing and sale of their polycarbonate plastic bottle products. Plaintiffs, including Movants here, seek, among other things, monetary damages including but not limited to appropriate injunctive relief, including but not limited to medical monitoring on behalf of all Class members and children of Class members to insure the early diagnosis and treatment for disorders associated with BPA exposure and monetary damages including a full refund of all costs associated with the purchase of Defendants' polycarbonate products produced with BPA.

## III.   ARGUMENT

### A.   Consolidation of the Actions against Defendants is Appropriate Pursuant to 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407(a), a party may request that the Panel transfer and consolidate two or more civil cases for pretrial proceedings upon a determination that the cases (a) "involv[e] one or more common questions of fact"; (b) the transfer and consolidation of the cases would further "the convenience of the parties and the witnesses," and (c) the transfer and consolidation will "promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407. As set forth in detail below, the pending actions meet these criteria and should be transferred and consolidated for pretrial proceedings.

### i.   The Actions Involve One or More Common Questions of Fact

The first Section 1407 requirement – that the cases "involv[e] one or more common questions of fact" – is plainly met here. The actions against defendants are premised upon the same core allegations. In this regard, the substantive factual and legal theory of the complaints against defendants are identical – *i.e.*, that defendants produced, manufactured and/or distributed polycarbonate plastic bottle products containing the industrial chemical BPA. The injuries sustained by Movants and members of the Class flow, in each instance, from this common nucleus of facts. Common issues will predominate in the defendant class as well. Moreover, individual questions, if any, pale by comparison to the numerous common questions that predominate. The common questions in the actions here include, *inter alia*,

a) Whether Defendants represented to consumers that the products had a characteristic, use, benefit or quality that rendered the products safe to use for their intended purpose;

b) Whether the products in fact have a characteristic, use, benefit or quality that renders them unsafe for their intended purpose;

6

c)  Whether the products were defectively designed;

d)  Whether Defendants failed to accurately and sufficiently warn of the defective characteristics of the product;

e)  Whether Defendants knowingly concealed the defective design of the products;

f)  Whether Defendants were unjustly enriched

Therefore, the actions that are subject to Movants' motion to transfer as well as and those subsequently filed related actions, clearly fall within the scope of the Panel as they all involve common of questions of fact and are based on the same legal theories.

### ii.   Consolidation will Further the Convenience of Parties and Witnesses

The Panel may transfer and consolidate cases pending in different districts when such cases threaten duplicative discovery, and transfer of the cases would be for the "convenience of [] parties and witnesses." 28 U.S.C. § 1407.

Because the actions are premised upon the very same misconduct related to the polycarbonate plastic bottles containing BPA and assert similar causes of action, discovery will be duplicative without consolidation. Movants anticipate that the plaintiffs in all of the actions will seek to depose a similar core of individuals believed to be involved in, or who have relevant knowledge about the polycarbonate plastic bottles containing BPA. The time and expense saved by consolidation of these proceedings will benefit the plaintiffs, the defendants and the judicial system as a whole. The Panel has repeatedly recognized that the creation of a centralization MDL forum is appropriate for this very reason. *See, e.g., In re Visa/MasterCard Antitrust Litig.*, 295 F.Supp. 2d 1379, 1380 (J.P.M.L. 2003) ("centralization under § 1407 is thus necessary in order to avoid duplication of discovery …and conserve the resources of the parties, their counsel and the judiciary"); *In re Merscorp, Inc., Real Estate Settlement Procedures Act (RESPA) Litig.*,

7

473 F. Supp. 2d 1379, 1379 (J.P.M.L. 2007) (holding that centralization under Section 1407 was warranted where centralization was necessary in order to eliminate duplicative discovery); *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651, (J.P.M.L. 1981) (transfer and consolidation would "effectuate a significant overall savings of cost and a minimum of inconvenience to all concerned with the pretrial activities').

### iii.   Consolidation will Prevent Conflicting Pretrial Rulings and Disparate Treatment of the Same Nationwide Class

Consolidation of the cases will also "promote the just and efficient conduct of the actions." 28 U.S.C. § 1407. The Panel has frequently expressed the need for consolidation where there is a likelihood of inconsistent pretrial rulings during various stages of the litigation, including the class certification stage. *See In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) (observing that the Panel has "consistently held that transfer of actions under § 1407 is appropriate, if not necessary, where the possibility of inconsistent class determination exists"); *see also In re TMJ Implants Prods. Liab. Litig.*, 844 F.Supp. 1553, 1554 (J.P.M.L. 1994) ("Centralization under section 1407 is necessary … in order to prevent inconsistent rulings"). Here, the actions assert overlapping claims on behalf of the same nationwide class. Each action presents issues that, if subject to different pretrial rulings, would result in disparate treatment of members of the same nationwide class.

Therefore, given the similarly of the proposed class and the claims proposed by the proposed class in all of the actions, Movants respectfully submit that the parties and the court would benefit form having a single judge oversee the class action issues and pretrial process to avoid duplicative efforts and inconsistent rulings. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 568 F. Supp. 1250, 1251 (J.P.M.L. 1983) (centralization necessary where overlapping class certifications sought in all relevant actions); *In re Resource Exploration, Inc.*

8

*Sec. Litig.*, 483 F.Supp. 817, 821 (J.P.M.L. 1980) ("An additional justification for transfer is the fact that most of the actions before us have been brought on behalf of similar or overlapping classes of purchasers of the limited partnerships").

**B.    The Panel Should Transfer the Actions to the Northern District of Illinois**

The Panel's determination of the appropriate venue in which to consolidate the pretrial proceedings in these related actions is similarly guided by Section 1407(a).  Following this standard in the instant situation, the Northern District of Illinois emerges as a proper venue because it possesses a significant nexus to the litigation and best promotes and serves the convenience of the parties and witnesses and the just and efficient conduct of the actions.  *See* 28 U.S.C. § 1407.

**i.    The Hon. David H. Coar Is An Experienced MDL Jurist and the Northern District of Illinois Has the Experience and Resources to Properly Handle the Actions**

The Northern District of Illinois has the experience and resources to handle complex litigation and has proven its track record in this regard; transfer under Section 1407 will allow for the just and expeditious resolution of these actions in a manner beneficial to all parties, as a single judge will formulate a streamlined pretrial schedule governing this litigation.  Indeed, in determining the appropriate location for the transferee district in multidistrict litigation, the Panel has recognized consistently the benefits of transfer to the Northern District of Illinois, which clearly possesses the necessary resources and judicial expertise to manage complex multidistrict litigation.  *See e.g., In re: Aqua Dots Products Liability Litigation,* 2008 WL 1395771, MDL No. 1940 (transferred to Judge Coar, N.D. Ill., April 9, 2008); *In re: Air Crash Near Medan, Indonesia on September 5, 2005,* 2008 WL 1392814, MDL No. 1925 (transferred to the Northern District of Illinois on April 10, 2008); *In re: Texas Roadhouse Fair and Accurate Transactions*

9

*Act (FACTA) Litigation,* 2008 WL 926079, MDL No. 1927 (transferred April 7, 2008); *In Re RC2 Corp. Toy Lead Paint Products Liability Litigation,* 528 F.Supp.2d 1374 (J.P.M.L. 2007).

Judge David Coar's track record speaks for itself as well. Judge David H. Coar has considerable experience handling multidistrict litigation in his fourteen years at the U.S. District Court, which followed eight years as a judge in U.S. Bankruptcy Court. This Panel has recognized his experience and transferred three separate multidistrict actions to his court.[4] Judge Coar has demonstrated his willingness and his ability to manage large multidistrict cases involving complicated issues of law and fact, including products liability actions like this case.

    **ii.    The Northern District of Illinois is the Location of Defendant Avent Headquarters and Is The Location of Many Key Witnesses and Documents**

The Panel has consistently recognized that a proper transferee forum is the forum where relevant documents and witnesses are located. *See, e.g., In re Live Concert Antitrust Litig.,* 429 F. Supp. 2d 1363, 1364 (J.P.M.L. 2006) (transferring action to Central District of California since the district is "likely to provide a substantial number of witnesses and documents" as it is the district where defendant is headquartered).

Avent America, Inc., a defendant in the Illinois action, is an Illinois corporation with its principal offices located in Illinois. Avent produces, manufactures, distributes, and/or sells several different polycarbonate plastic bottle products, including baby bottles and baby accessories; as Avent's headquarters and principal operations are located in Illinois, Illinois is the proper transferee forum since the relevant documents and witnesses are located there. *See In re McDonald's French Fries Litig,* 444 F.Supp.2d 1342, 1343 (J.P.M.L. 2006) (transferring actions

---

[4] The Panel has transferred the following cases to Judge Coar: *In re: Aqua Dots Products Liability Litigation,* 2008 WL 1395771, MDL No. 1940 (transferred to Judge Coar, April 9, 2008); *In re JP Morgan Chase & Co. Securities Litigation,* 452 F.Supp.2d 1350 (J.P.M.L. 2006); *In re Sulfuric Acid Antitrust Litigation,* 270 F. Supp. 2d 1379 (J.P.M.L. 2003) (transferring action to Judge David H. Coar, noting Northern District of Illinois was "equipped with the resources that this complex antitrust docket is likely to require").

to the Northern District of Illinois because it is a likely source of relevant documents and witnesses since McDonald's headquarters is located there); *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litig.*, 381 F.Supp.2d 1383, 1384 (J.P.M.L. 2005) (transferring actions to the Northern District of Illinois because Sears' corporate headquarters and many of its documents and witnesses are located there); *In Re RC2 Corp. Toy Lead Paint Products Liability Litigation*, 528 F.Supp.2d 1374 (J.P.M.L. 2007) (transferring MDL to Northern District of Illinois as "defendant RC2 is headquartered [in Illinois], and, therefore, discovery will likely be found there").

### iii. All Defendants have Substantial Contacts in the Northern District of Illinois

Defendants Gerber Products Company,[5] Playtex Products, Inc.,[6] EvenFlo Company, Inc.,[7] Philips Electronics North America Corporation,[8] New Wave Enviro Products,[9] Nalge Nunc International Company,[10] Handi-Craft Company[11] and RC2,[12] as well as other producers, manufacturers, and/or distributors of polycarbonate plastic bottle products containing the BPA, all have substantial contacts in the Northern District of Illinois. The Northern District of Illinois is a prime location where each Defendant transacts business. In addition, key documents and witnesses relevant to all actions will be located within the Northern District of Illinois, which is the headquarters of Defendant Avent. The headquarters of the other key named Defendants are also convenient to the Northern District of Illinois. Transfer of these actions to the Northern

---

[5] Defendant Gerber Products Company is a Michigan Corporation.
[6] Defendant Playtex Products, Inc. is a Connecticut Corporation.
[7] Defendant Evenflo Company, Inc. is an Ohio Corporation.
[8] Defendant Philips Electronics North America Corporation is a Delaware Corporation.
[9] Defendant New Wave Enviro Products is a Nevada Corporation.
[10] Defendant Nalge Nunc International Company is a Delaware Corporation with principal business offices in New York.
[11] Defendant Handi-Craft Company is headquartered in Missouri.
[12] Defendant RC2 is a Delaware Corporation.

District of Illinois will avoid duplicative discovery and inconsistent rulings, particularly at the class certification stage, and will act to substantially streamline this litigation. Finally, the Northern District of Illinois is convenient to all parties and their counsel. Thus, the Northern District of Illinois is the logical and convenient location for transfer of these actions

## IV.    CONCLUSION

For all the reasons set forth above, plaintiff respectfully requests that the Panel transfer the cases against Defendants for coordinated pretrial proceedings to the Northern District of Illinois.

DATED:        May 20, 2008                    Respectfully Submitted,


                                   /s/ Edith M. Kallas
                                  Edith M. Kallas
                                Joe R. Whatley
                                Dominique Day
                                **WHATLEY DRAKE & KALLAS, LLC**
                                1540 Broadway, 37th Floor
                                New York, New York  10036
                                Phone: (212) 447-7070
                                Fax:  (212) 447-7077
                                *ekallas@wdklaw.com*
                                *jwhatley@wdklaw.com*
                                *dday@wdklaw.com*

                                John G. Emerson
                                Scott E. Poynter
                                **EMERSON POYNTER LLP**
                                The Museum Center
                                500 President Clinton Ave, Suite 305
                                Little Rock, AR 72201
                                Phone:  (501) 907-2555
                                Fax:  (501) 907-2556
                                www.emersonpoynter.com

                                Jack T. Patterson, II
                                Arkansas State Bar No. 95012
                                Jeremy Y. Hutchinson
                                Arkansas State Bar No.  2006-145

**PATTON ROBERTS, PLLC**
The Stephens Building
111 Center Street, Suite 1315
Little Rock, AR  72201
Phone:  (501) 372-3480
Fax: (501) 372-3488
*jpatterson@pattonroberts.com*
*jhutchinson@pattonroberts.com*

Jim Wyly
Arkansas Bar No. 90158
**PATTON ROBERTS, PLLC**
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas  75505-6128
Phone:  (903) 334-7000
Fax:  (903) 334-7007
*jwyly@pattonroberts.com*

***Counsel for Plaintiffs Elizabeth Banse, Sharon
Hatter and Dale Raggio***



FILED
LODGED
RECEIVED    **MAIL**

MAY 27 2008

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

In Re Bisphenol-A Tainted Polycarbonate Plastic Litigation         MDL Docket No. _____

_____/

## AMENDED SCHEDULE OF ACTIONS AFFECTED BY PLAINTIFFS'
## MOTION FOR TRANSFER AND CENTRALIZATION OF ALL BISPHENOL-
## A TAINTED POLYCARBONATE PLASTIC LITIGATION TO THE
## NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 U.S.C. § 1407

Pursuant to Rule 7.2(ii) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, Plaintiffs provide the following information on the actions that will be affected by this

Motion:

| Case Caption | Court | Civil Action Number | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiff:** Dale L. Raggio, Jr. **Defendant:** Gerber Products Company | Eastern District of Arkansas (Western Division- Little Rock) | 4:08-cv-00403 | May 7, 2008 | Judge J. Leon Holmes |

| Case Caption | Court | Civil Action Number | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiff:** Naayda Lanza **Defendants:** Avent America, Inc. Does 1-100, inclusive | Central District of California (Western Division- Los Angeles) | 2:08-cv-02960 | May 6, 2008 | Judge Audrey B. Collins |
| **Plaintiff:** Paul Rasmussen **Defendants:** Handi-Craft Company Does 1-100, inclusive | Central District of California (Western Division - Los Angeles) | 2:08-cv-02961 | May 6, 2008 | Judge A. Howard Matz |
| **Plaintiff:** LeeAnne Matusek **Defendants:** Gerber Products Company Does 1-100, inclusive | Central District of California (Western Division - Los Angeles) | 2:08-cv-02962 | May 6, 2008 | Judge Florence-Marie Cooper |
| **Plaintiff:** Kim O'Neill **Defendant:** Evenflo Company, Inc Does 1-100, inclusive | Central District of California (Western Division - Los Angeles) | 2:08-cv-02963 | May 6, 2008 | Judge Dean D. Pregerson |
| **Plaintiff:** Lani Felix-Lozano **Defendant:** Nalge Nunc International Corporation | Eastern District of California (Sacramento) | 2:08-cv-00854 | April 22, 2008 | Judge John A. Mendez |

| Case Caption | Court | Civil Action Number | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiff:** Judith Thompson-Foster **Defendants:** Gerber Products Company Playtex Products, Inc. | Eastern District of California (Sacramento) | 2:08-cv-01073 | May 13, 2008 | Judge John A. Mendez |
| **Plaintiff:** Ashley Campbell **Defendant:** Playtex Products, Inc. | District of Connecticut (Hartford) | 3:08-cv-00763 | May 19, 2008 | Judge Warren W. Eginton |
| **Plaintiff:** Elizabeth Banse **Defendant:** Avent America, Inc. | Northern District of Illinois (Eastern Division-Chicago) | 1:08-cv-02604 | May 6, 2008 | Judge David H. Coar |
| **Plaintiffs:** Zachary Wilson Carissa Wilson Chris Mathia Michelle Mathia Aisha Waiters Michael C. Liem Michelle L. Liem **Defendants:** Avent America, Inc. Handicraft Company d/b/a Dr. Brown's Evenflo Company, Inc. Gerber Novartis AG Playtex Products, Inc. | District of Kansas (Kansas City) | 2:08-cv-02201 | May 1, 2008 | Judge Kathryn H. Vratil |

3

| Case Caption | Court | Civil Action Number | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiffs:**<br>Maria Sullivan<br>Katherine Capita<br>Daniel Capita<br>Jennifer Moellering<br>Rick Moellering<br>**Defendants:**<br>Avent America, Inc.<br>Handi-craft Company<br>Evenflo Company, Inc.<br>Gerber Products Company<br>Playtex Products, Inc. | Western District of Missouri<br>(Western Division-Springfield) | 4:08-cv-00309 | April 30, 2008 | Judge Richard E. Dorr |
| **Plaintiff:**<br>Sharon Hatter<br>**Defendant:**<br>New Wave Enviro Products | Western District of Missouri<br>(Western Division-Springfield) | 6:08-cv-03154 | April 30, 2008 | Judge Ortrie D. Smith |
| **Plaintiffs:**<br>Sarah Jaynes<br>Diane Stoebe<br>Brynnen Ford<br>**Defendants:**<br>Avent America, Inc.<br>Philips Electronics North America Corporation<br>Evenflo Company, Inc.<br>Gerber Products Company<br>Playtex Products, Inc.<br>RC2 | Western District of Washington<br>(Seattle) | 2:08-cv-00693 | May 2, 2008 | Judge Marsha J. Pechman |

4

| Case Caption | Court | Civil Action Number | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiffs:**<br>Chloe Gale<br>Ruth Levine<br>Kathleen Gillespie<br>Adam Ruben<br>Sarah Dijulio<br>**Defendants:**<br>RC2<br>Avent America, Inc.<br>Philips Electronics<br>North America<br>Corporation<br>Evenflo Company, Inc.<br>Gerber Products<br>Company<br>Playtex Products, Inc. | Western District of Washington (Seattle) | 2:08-cv-00702 | May 5, 2008 | Judge John C. Coughenour |

A courtesy copy of the complaint pending in the District of Connecticut, *Campbell v. Playtex Products, Inc.,* 08-CV-00763 WWE (D. Conn.), the only complaint not included in the May 16, 2008 filing, is attached hereto.


DATED:        May 20, 2008              Respectfully Submitted,


                                        ____/s/ Edith M. Kallas____
                                        Edith M. Kallas
                                        Joe R. Whatley
                                        Dominique Day
                                        **WHATLEY DRAKE & KALLAS, LLC**
                                        1540 Broadway, 37th Floor
                                        New York, New York  10036
                                        Phone: (212) 447-7070
                                        Fax:  (212) 447-7077
                                        *ekallas@wdklaw.com*

5

*jwhatley@wdklaw.com*
*dday@wdklaw.com*
John G. Emerson
Scott E. Poynter
**EMERSON POYNTER LLP**
The Museum Center
500 President Clinton Ave, Suite 305
Little Rock, AR 72201
Phone:  (501) 907-2555
Fax: (501) 907-2556
*jemerson@emersonpoynter.com*
*scott@emersonpoynter*

Jack T. Patterson, II
Arkansas State Bar No. 95012
Jeremy Y. Hutchinson
Arkansas State Bar No.  2006-145
**PATTON ROBERTS, PLLC**
The Stephens Building
111 Center Street, Suite 1315
Little Rock, AR  72201
Phone:  (501) 372-3480
Fax:  (501) 372-3488
*jpatterson@pattonroberts.com*
*jhutchinson@pattonroberts.com*

Jim Wyly
Arkansas Bar No. 90158
**PATTON ROBERTS, PLLC**
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas  75505-6128
Phone:  (903) 334-7000
Fax:  (903) 334-7007
*jwyly@pattonroberts.com*

***Counsel for Plaintiffs Elizabeth Banse, Sharon
Hatter and Dale Raggio***





AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                        DEPUTY

## BEFORE THE JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

In Re Bisphenol-A Tainted Polycarbonate Plastic Litigation        MDL Docket No. _____

_____/

### PROOF OF SERVICE

     I, Dominique Day, certify that on May 20, 2008, I caused copies of the Amended

Motion of Plaintiffs Elizabeth Banse, Sharon Hatter and Dale L. Raggio, Jr. ("Plaintiffs")

pursuant to 28 U.S.C. § 1407 for transfer and centralization of all litigation relating to Bisphenol-

A Tainted Polycarbonate Plastic in the Northern District of Illinois; Amended Schedule of

Actions Affected by the Motion to Transfer; and Amended Memorandum in Support of the

Motion to Transfer to be served via U.S. mail, first class postage pre-paid, to the following:

Scott E. Poynter, Esq.
Christopher D. Jennings, Esq.
Gina M. Cothern, Esq.
Emerson Poynter LLP
500 President Clinton Ave., Suite 305
Little Rock, AR 72201
*(Counsel for Plaintiffs Dale L. Raggio, Jr., Elizabeth Banse and Sharon Hatter)*

*(Counsel for Plaintiffs Zachary Wilson, Carissa Wilson, Chris Mathia, Michelle Mathia, Aisha Waiters, Michael C. Liem, Michelle L. Liem, Maria Sullivan, Katherine Capita, Daniel Capita, Jennifer Moellering and Rick Moellering)*

Robert H. Weiss, Esq.
Stephen David Murakami, Esq.
Marissa C. Lau, Esq.
Law Offices of Robert H. Weiss, PLLC
50 Jericho Turnpike, Suite 201
Jericho, NY 11753
*(Of Counsel for Plaintiffs Zachary Wilson, Carissa Wilson, Chris Mathia, Michelle Mathia, Aisha Waiters, Michael C. Liem, Michelle L. Liem, Maria Sullivan, Katherine Capita, Daniel Capita, Jennifer Moellering and Rick Moellering)*

Knoll Lowney, Esq.
Richard A. Smith, Esq.
Bridget Baker-White, Esq.
Brian Knutsen, Esq.
Smith & Lowney, PLLC
2317 East John St.
Seattle, WA 98112
*(Counsel for Plaintiffs Sarah Jaynes, Diane Stoebe, Brynnen Ford, Chloe Gale, Ruth Levine, Kathleen Gillespie, Adam Ruben, Sarah Dijulio, Class and Subclass)*

Steve W. Berman, Esq.
Hagens Berman Sobol Shapiro
1301 Fifth Avenue, Suite 2900
Seattle, WA, 98101
*(Counsel for Plaintiffs Sarah Jaynes, Diane Stoebe, Brynnen Ford, Chloe Gale, Ruth Levine, Kathleen Gillespie, Adam Ruben, Sarah Dijulio, Class and Subclass)*

Norman Rifkind, Esq.
Leigh R. Lasky, Esq.
Amelia S. Newton, Esq.
Lasky & Rifkind, Ltd.
350 N LaSalle Street, Suite 1320
Chicago, IL 60610
*(Local Counsel for Plaintiff Elizabeth Banse)*

James E. Hartley, Jr., Esq.
Drubner & Hartley, LLC
500 Chase Parkway
Waterbury, CT 06708
*(Counsel for Plaintiff Ashley Campbell)*

Timothy C. Hutchinson, Esq.
Williams & Hutchinson, LLP
5417 Pinnacle Point Drive, Suite 500
Rogers, AR 72758

*(Counsel for Plaintiff Sharon Hatter)*

Jack T. Patterson, II, Esq.
Jeremy Y. Hutchinson, Esq.
Patton Roberts, PLLC
111 Center Street, Suite 1315
Little Rock, AR 72201
*(Counsel for Plaintiff Ashley Campbell)*

3

Jim Wyly, Esq.
Sean Rommel, Esq.
Patton Roberts, PLLC
Century Bank Plaza, Suite 400, P.O. Box 6128
Texarkana, Texas 75505-6128
*(Counsel for Plaintiff Ashley Campbell)*

Michael H. Steinberg, Esq.
Sullivan & Cromwell, LLP
1888 Century Park East
Los Angeles, CA 90067

*(Counsel for Defendants Avent America, Inc.)*

Playtex Products, Inc.
General Counsel
300 Nyala Farms Road
Westport, CT 06880
*(Defendant)*

Playtex Products, Inc.
c/o Connecticut Secretary of State
State of Connecticut Corp. Div'n
30 Trinity Street
Hartford, CT 06106
*(Defendant)*

Playtex Products, Inc.
CT Corporation System
818 West Seventh Street
Los Angeles, CA 90017
*(Defendant)*

EvenFlo Company, Inc.
General Counsel
Spaulding Holdings Corp.
707 Crossroads Court
Vandalia, OH 45377
*(Defendant)*

James G. Stranch, III, Esq.
J. Gerard Stranch, IV, Esq.
Branstetter Stranch & Jennings PLLC
227 Second Avenue North, Fourth Floor
Nashville, TN 37201
*(Counsel for Plaintiff Ashley Campbell)*

Rachel Jari Feldman, Esq.
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
*(Counsel for Defendants Gerber Products Company)*

Nalge Nunc International Company
The Corporation Trust Company
Corporation Trust Center
1209 OrangeStreet
Wilmington, DE 19801
*(Defendant)*

New Wave Enviro Products
General Counsel
6595 S. Dayton Street
Suite 1000
Englewood, CO 80111
*(Defendant)*

Handi-Craft Company
General Counsel
4433 Fyler Ave.
St. Louis, MO 63116
*(Defendant)*

Handi-Craft Company
Peter W. Herzog
515 N. 6th Street, 24th Floor
St. Louis, MO 63101
*(Defendant)*

EvenFlo Company, Inc.
CT Corporation System
1300 E. 9th Street
Cleveland, OH 44114
*(Defendant)*

RC2
General Counsel
1111 W. 22nd Street
Suite 320
Oak Brook, IL 60523
*(Defendant)*

Nalge Nunc International Company
General Counsel
75 Panorama Creek Drive
Rochester, NY 14625
*(Defendant)*

Philips Electronics North America Corp.
General Counsel
1251 Avenue of the Americas
New York, NY 10020
*(Defendant)*

Clerk of the Court
United States District Court
Eastern District of Arkansas (Little Rock)
500 West Capitol Avenue
Little Rock, AR 72201

Clerk of the Court
United States District Court
District of Kansas (Kansas City)
500 State Ave.
259 U.S. Courthouse
Kansas City, Kansas 66101

Clerk of the Court
United States District Court
Central District of California (Los Angeles)
255 East Temple Street
Los Angeles, CA 90012

Clerk of the Court
United States District Court
District of Connecticut (Hartford)
Abraham Ribicoff Federal Building
450 Main Street
Hartford, CT 06103

Clerk of the Court
United States District Court
District of Connecticut (Bridgeport)
Brien McMahon Federal Building
915 Lafayette Boulevard
Bridgeport, CT 06604

Clerk of the Court
United States District Court
Western District of Missouri
(Western Division- Springfield)
400 E. 9th Street, Room 1510
Kansas City, MO 64106

Clerk of the Court
United States District Court
Eastern District of California (Sacramento)
501 I Street, Suite. 4-200
Sacramento, CA 95814

United States District Court
Western District of Washington (Seattle)
U.S. Courthouse
700 Stewart Street, Lobby Level
Seattle, WA 98101

Clerk of the Court
United States District Court
Northern District of Illinois (Chicago)
Everett McKinley Dirksen
United States Courthouse
219 South Dearborn Street
Chicago, IL 60604


Dated:  May 20, 2008

Respectfully Submitted,

**Whatley Drake & Kallas, LLC**

By: _____ /s/ Dominique Day _____

Dominique Day
1540 Broadway, 37th Floor
New York, NY 10036
(212) 447-7070

6